929 A.2d 61

ATTORNEY GRIEVANCE COMMISSION of Maryland

v.

Angela Therese FLOYD.

Misc. Docket (Subtitle AG) No. 31, Sept. Term, 2006.

Court of Appeals of Maryland.

July 30, 2007.

Fletcher P. Thompson, Asst. Bar Counsel (Melvin Hirshman, Bar Counsel for Atty. Grievance Com'n), for petitioner.

James T. Maloney (Maloney & Mohsen), Washington, DC, for respondent.

Argued before BELL, C.J., RAKER, CATHELL, HARRELL, BATTAGLIA, GREENE and ALAN M. WILNER, (retired, specially assigned), JJ.

BATTAGLIA, J.

The Attorney Grievance Commission of Maryland ("Petitioner"), acting through Bar Counsel and pursuant to Maryland Rule 16–751(a),[1] filed a petition for disciplinary or remedial action against Respondent, Angela Therese Floyd, on August 30, 2006, in which Bar Counsel alleged that Respondent violated Maryland Rule of Professional Conduct 8.4(c) (Misconduct)[2] when, during an employment application process for a legal position, in order to secure a higher salary, she acted intentionally to deceive the Federal Trade Commission ("Commission") into believing that she and her husband had a "purely" employer-employee relationship.

In accordance with Maryland Rules 16–752(a) and 16–757(c),[3] we referred the petition to Judge Larnzell Martin of

---

1. Maryland Rule 16–751(a) provides:
 (a) **Commencement of disciplinary or remedial action.** (1) Upon approval of [the Attorney Grievance] Commission. Upon approval or direction of the [Attorney Grievance] Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals.

2. Rule 8.4 provides in relevant part:
 It is professional misconduct for a lawyer to:
 * * *
 (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation. . . .

3. Maryland Rule 16–752(a) states:

the Circuit Court for Prince George's County for an evidentiary hearing and to make findings of fact and conclusions of law. Judge Martin held a hearing on January 4, 2007, and on February 13, 2007, issued Findings of Fact and Conclusions of Law, in which he found by clear and convincing evidence that Respondent had violated Rule 8.4(c):

### *Findings of Fact*

"The following facts have been proven by clear and convincing evidence.

"1. November 1995 through August 1996, Angela Floyd ('Respondent') was employed as Office Manager for the 'Office of Attorney Frederick D. Iverson, Columbus, Ohio.'

"2. September 1996, Frederick D. Iverson ('Iverson') moved to the District of Columbia to join Respondent, who had begun attendance at Georgetown University Law School

"3. Respondent and Iverson married each other in 1998 and Respondent chose to continue to use her maiden name.

"4. Iverson started his practice in the District of Columbia in 1998.

"5. Respondent was admitted to the practice of law in Maryland on December 14, 1999 after graduating from Georgetown University Law School in May 1999.

"6. The bulk of Iverson's clients during this time came from court-appointed Criminal Justice Act cases.

"7. In 1998, Iverson's gross income from his law practice was $17,172 and his net income was $4,990.

---

(a) **Order.** Upon the filing of a Petition for Disciplinary or Remedial Action, the Court of Appeals may enter an order designating a judge of any circuit court to hear the action and the clerk responsible for maintaining the record. The order of designation shall require the judge, after consultation with Bar Counsel and the attorney, to enter a scheduling order defining the extent of discovery and setting dates for the completion of discovery, filing of motions, and hearing. Maryland Rule 16–757(c) states in pertinent part:

The judge shall prepare and file or dictate into the record a statement of the judge's findings of fact, including findings as to any evidence regarding remedial action, and conclusions of law.

"8. In 1999, Iverson's gross income from his law practice was $57,761 and his net income was $32,358.

"9. In 2000, Iverson's gross income from his law practice was $152,010 and his net income was $101,182.

"10. After Respondent graduated from law school, she assisted her husband, Frederick Iverson, Esquire ('Iverson') in his solo criminal defense practice.

"11. Respondent was not paid by Iverson for her work with him.

"12. Iverson practiced primarily from his office at his and Respondent's home located at 643 Pennsylvania Avenue, SE, Washington, D.C.

"13. Iverson reasonably used 1025 Connecticut Avenue, NW, Suite 1012, Washington, DC 20036, as a business address.

"14. Through it was Iverson's desire that Respondent would join Iverson in his practice of law on a permanent basis, early 2000, Respondent decided to apply for positions outside of Iverson's office.

"15. In February of 2000, Respondent applied for an entry level job at the Federal Trade Commission ('the Commission') as an attorney.

"16. With her Commission application, Respondent submitted a résumé that listed her current employment as a position with the 'Law Office of Frederick Iverson, Washington, DC,' without disclosing that he was her husband. On the second page of the résumé, Respondent listed 'Attorney Frederick Iverson, 1025 Connecticut Avenue, NW, Suite 1012, Washington, DC 20036' as a reference, without disclosing that he was her husband.

"17. In the résumé that was submitted to the Commission, Respondent did not disclose that she had worked for her husband in Columbus, Ohio during the period of November 1995 through August 1996.

"18. Respondent's Ohio employment with Iverson was listed on a résumé that she submitted to the Securities & Exchange Commission in 1997.

"19. Even though Respondent omitted her Ohio employment with Iverson in the résumé she submitted to the Commission, Respondent listed in that same résumé jobs that she held before she had first worked for Iverson.

"20. Respondent interviewed for the Commission job with Joni Lupovitz, Esquire ('Lupovitz') and later with Elaine Kolish, Esquire, who was an associate director of the Commission's Bureau of Enforcement ('Kolish').

"21. During the hiring process, March 13, 2000 Lupovitz called Iverson as part of a reference check.

"22. Iverson gave Respondent a strong recommendation, stating that he recommended her '100 percent' and that he wanted her to join his practice.

"23. During his conversation with Lupovitz, Iverson did not disclose that he was Respondent's husband.

"24. Shortly after March 13, 2000, the Commission decided to offer Respondent a position as an attorney at a grade level of GS–11, step 1, which carried a salary of $42,724 per year.

"25. Lupovitz called Respondent to communicate the offer. During this conversation, Lupovitz advised Respondent that in order for consideration of hiring her at a salary higher than that for the grade level of GS–11, step 1, she would have to have a competing job offer, or be currently employed at a higher salary.

"26. The Commission's decision to hire Respondent was based in part, but not exclusively on Iverson's reference on her behalf; however, it cannot be said that without his recommendation Respondent would not have been offered the position with the Commission.[1]

---

"[1] See Petitioner's Exhibit 2, page 2: 'Ms. Floyd received excellent references from two [Securities and Exchange Commission] supervisors and from attorney Frederick Iverson, all of whom praised Ms. Floyd's excellent legal skills, intellect, and hard work. All three references emphasized that Ms. Floyd's outstanding performance and personal demeanor exceeded expectations for a law student and young attorney.'

"27. Respondent wanted to be paid a higher salary than $42,724 per year that accompanied that for grade level GS–11, step 1 and requested of Iverson that he put in writing his officer of employment with him.

"28. On March 16, 2000, Iverson composed a letter on stationary displaying his 1025 Connecticut Avenue N.W., Washington, D.C., office address, stating:

Angela Floyd

643 Pennsylvania Avenue, SE

Washington, D.C. 20003

Dear Ms. Floyd:

This letter is written to memorialize the salary terms of my offer to you. Per our discussion, I am prepared to offer you a monthly salary of $4500 per month, or $54,000 per year. This salary is based on your completing a minimum average of six criminal misdemeanor cases per month. This arrangement would remain in effect for one year and, thereafter, be open to renegotiation.

Regardless of where your future employment decisions take you, I wish you the best of luck in your career.

Sincerely,

/S/

Frederick D. Iverson, Esq.

"29. Respondent was aware of the contents of Iverson's letter before she delivered it to the Commission.

"30. Respondent delivered Iverson's letter to Lupovitz, who in turn gave it to Kolish.

"31. On March 28, 2000, by memorandum, Kolish requested of the Commission's Director of Human Resources, authority to offer Respondent a position at GS–11, step 7 with the accompanying annual salary of $51,269.

"32. The subject of Kolish's March 28, 2000 memorandum was 'Justification for hiring Angela Floyd as a GS–11, step 7.' The memorandum begins,

The Division of Enforcement seeks to hire Angela Floyd, a May 1999 graduate of Georgetown University Law

Center, as a staff attorney. Since August 1998, Ms. Floyd has worked in the Law Office of Frederick Iverson, which has made an employment offer to her at a salary of $54,000 per year. A copy of the written offer letter is attached. Therefore, to compete with that offer and given Ms. Floyd's excellent credentials, we recommend that she be offered the grade of GS–11, step 7, at a salary of $51,269.

"33. Kolish received the requested authority. Respondent was offered a position at GS–11, step 7, and began work at the Commission shortly afterwards.

"34. Respondent and Iverson elected not to disclose their marital relationship because they did not consider it relevant to the hiring decision.

"35. In various employment documents, required to be completed for purposes unrelated to Respondent's actual hire, Respondent identified Iverson as her husband when that information was specifically requested.

"36. Kolish and Lupovitz did not become aware of the relationship between Respondent and Iverson until 2004, when they were advised of the fact by the Commission's Office of General Counsel.

"37. After the discovery that Respondent and Iverson were married, a meeting was held in Kolish's office between Kolish, Lupovitz, Respondent and John Graubert, Esquire of the Office of General Counsel.

"38. At the meeting, Respondent was advised that Kolish and Lupovitz viewed her failure to disclose her marriage to Iverson as misleading and advised her to be more concerned about appearances in the future.

"39. No formal disciplinary action was taken; however, the matter was referred to the Attorney Grievance Commission of Maryland.

"40. For reasons that do not relate to the issues raised in the *Petition for Disciplinary or Remedial Action,* Respondent is no longer employed by the Commission.

## Discussion

"Rule 8.4 (c) provides

It is professional misconduct for a lawyer to:

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

"Petitioner contends that Respondent's concealment of her marital relationship with Iverson was an implicit representation to the Commission that Iverson was someone with whom she had only a business relationship, and that this representation was deceitful and dishonest because it led the Commission to believe that Iverson's recommendation and competing job offer were made by someone who was unbiased and who had no financial stake in the amount of money offered to her by the Commission.

"Respondent argues that § 720.901 of the Code of Federal Regulations ("C.F.R.") prohibits the federal government from discriminating against her on the basis of her marital status. She then asserts that this regulation excused her from disclosing that the individual who was providing a job recommendation and a competing job offer was her husband.

"C.F.R. § 720.901 provides

Equal opportunity without regard to politics or marital status.

(a) *In appointments and position changes.* In determining the merit and fitness of a person for a competitive appointment or appointment by non-competitive action to a position in the competitive service, an appointing officer shall not discriminate on the basis of the person's political affiliations, except when required by statute, or on the basis of marital status.

(b) *In adverse actions and termination of probationers.* An agency may not take an adverse action against an employee covered by part 752 of this chapter, not effect the termination of a probationer under part 315 of this chapter, (1) for political reasons, except when required by statute, or (2) because of marital status.

"Respondent did not *explicitly* misstate any fact. However, the law recognizes that deceit can be based on concealment of material facts as well as on overt misrepresentations. *Levin v. Singer,* 227 Md. 47, 64, 175 A.2d 423 (1961) ("Where concealment effectively suppresses material facts with the object of creating or continuing a false impression, a cause of action based on fraud may arise.") In *Brodsky v. Hull,* 196 Md. 509, 515–16, 77 A.2d 156 (1950), the Court of Appeals said that "[a] fact is material if its existence or nonexistence is a matter to which a reasonable man would attach importance in determining his choice of action in the transaction. . . ." While Petitioner does not have to prove the elements of fraud to establish a violation of Rule 8.4(c), these principles are useful in assessing Respondent's conduct.

"The Court accepts Respondent and Iverson's explanation as to why *they elected not to advise the Commission that they were married.* However, acceptance of that explanation does not resolve the question of whether their marriage was a fact that would have been material to either the hiring of Respondent, or the salary at which she was hired.

"The letter written on Iverson's office stationary with his Connecticut Avenue address to Respondent at their home address was clearly intended to be relied on for the purpose of attaining a salary greater than that to which Respondent, as a new hire, would have otherwise been entitled to receive. It was intended to be relied on and failure to disclose the actual relationship between Respondent and Iverson deprived the Commission of the opportunity to explore the *bona fides* of the offer.

"No reasonable person would accept that a relationship of spouse and spouse would not be relevant to whether an offering is to be relied upon as the product of an arms length relationship between the objects of an inquiry. Iverson's letter begins 'Dear Ms. Floyd', as though addressed to someone with whom Iverson had only a business relationship. The letter states the basis for the salary offer and sets out a standard of six cases per month that Respondent

would be expected to handle to earn it. In the last sentence of the first paragraph, Iverson sets out that the salary will be subject to 'renegotiation' at the end of one year. The concept of negotiation clearly creates the impression that the relationship between Respondent and Iverson was arm's length.

"An interesting feature of the letter is its concluding sentence, which states, "Regardless of where your future employment decisions take you, I wish you the best of luck in your career." Whatever personal message Iverson may have intended to convey to Respondent, the only reasonable conclusion from this sentence is that the two would have no further day-to-day contact if Respondent decided to work for the Commission.[2]

"Respondent's removal of the first period of employment with Iverson from her résumé concealed the fact that they had known each other for some time before 1998, the beginning year of Respondent's second period of employment with Iverson. A comparison of the résumé shows that on both résumés, Respondent listed three jobs she had before her first employment with Iverson, none of which was in the legal field. Inclusion of the first period of employment would have alerted the careful résumé reviewer to the fact that Respondent and Iverson had both moved to the District of Columbia from Columbus, Ohio, and would have led the careful résumé reviewer to question Respondent or Iverson about the coincidence and, if answered honestly, either would have disclosed the relationship between employer and employee. While one has to acknowledge great discretion in marshalling information to be included in a résumé, selective exclusion of information relevant to the weight to be given to various references is perilous when that which is excluded takes on more relevance with regard to benefits sought from the person from whom the information would be relevant.

---

"2 Iverson testified that the object of the final sentence of the letter was to assure Respondent that he would consider to support her

whatever decision she made, even though he would have preferred that she work with him.

---

"The Court elects not to question whether Respondent's value as reflected in Iverson's letter to Respondent. Indeed, the Commission could have determined that Respondent's income-making capacity at that moment in her career was equivalent to that expressed in Iverson's letter. But it is clear that such an impression, alone, would not have allowed Respondent's hire at an above entry-level salary. The failure to disclose the relationship between Iverson and Respondent had the natural consequence of depriving the Commission of an independent determination of the *bona fides* of Iverson's offer and Respondent reaped the intended benefit of the letter, the higher salary.

"The effect of Iverson's letter was to induce Kolish to seek authorization to offer Respondent a higher salary than that which was proposed in the original offer. While Kolish's March 28, 2000 memorandum refers to additional factors, all of them were in existence when the original offer was made. It is clear that Iverson's job offer was the principal motivating factor in Kolish's decision to seek a greater salary for Respondent. In short, Respondent knowingly concealed from the Commission that her job reference and her competing job offer came from her husband, knowing that the agency would assume that they came from someone who had no bias or ulterior motive. By suppressing a material fact, Respondent created a false impression and furthered it with the letter of March 16, 2000 to reap the benefit of a higher salary. *Levin v. Singer*, 227 Md. at 64, 175 A.2d 423. This conduct was deceitful.

"The Court is unable to see the connection urged by Respondent between her lack of disclosure and C.F.R. § 720.901. To disclose an intimate relationship between one who is identified as a person to be contacted to assess one's qualifications or one who has been identified as making a job offer to be honestly received as a basis for a salary

above that to which one might otherwise be qualified would not run afoul of the above-quoted regulation.

"Fully aware of the importance of references and the central role that a pending job offer would have on her starting salary, Respondent elected to involve her husband in her job application. Having done so, Respondent's failure to disclose that she and Iverson were married to each other, deprived the Commission of information material to its ability to make an appropriate assessment of Iverson's recommendation and job offer. C.F.R. § 720.901 cannot be read to shield Respondent from the prohibition of Rule 8.4(c) that she not engage in conduct involving deceit or misrepresentation.

## Conclusion

"On the basis of the foregoing Findings of Fact and Discussion, the Court concludes that Respondent violated Rule 8.4(c) of the Rules of Professional Conduct by engaging in conduct involving "deceit or misrepresentation". The deceit or misrepresentation was Respondent's failure to disclose to the Federal Trade Commission the fact that Frederick D. Iverson, Esquire was her husband. Respondent's failure to make this disclosure was exacerbated by her request to Iverson to produce a letter offering her a job at a salary above the entry-level for the position offered her by the Commission. This letter was necessary for Respondent to obtain a beginning salary of $51,269.00, rather than the $42,724.00, the Commission was otherwise authorized to offer Respondent. The relationship between Respondent and Iverson was material to the ability of the Commission to determine the *bona fides* of the job and salary offered in the letter provided by Iverson, an employer who had earlier given Respondent a "100% recommendation".

## Recommendation

"It is recommended that Respondent be reprimanded for violation of Rule 8.4(c), rather than suspended or disbarred, in light of the following mitigating circumstances:

"1) Respondent's husband actually desired at the time of the deceitful conduct that she would work with him;

"2) Sufficient other bases existed for the decision of the Commission to hire Respondent;

"3) It was possible that, had Respondent disclosed her relationship with Iverson, the Commission may have determined that his job offer to Respondent was *bona fide* and sufficient to merit the salary at which Respondent was hired; and

"4) The Commission was sufficiently satisfied with her performance as an agency attorney that it elected to confront Respondent and to continue her employment with the agency upon discovery of the deceit.

(emphasis in original).

## DISCUSSION

The hearing judge found that Respondent had violated Rule 8.4(c) by "engaging in conduct involving 'deceit or misrepresentation'." Neither Petitioner nor Respondent took exception to the hearing judge's findings of fact. Therefore, we accept the hearing court's findings of fact, as established, for the purpose of determining the appropriate sanction. Maryland Rule 16–759(b)(2)(A); *Attorney Grievance Comm'n v. Logan*, 390 Md. 313, 319, 888 A.2d 359, 363 (2005).

 We note that this Court has original and complete jurisdiction over attorney disciplinary proceedings.[4] *Attorney Grievance Comm'n v. Mininsohn*, 380 Md. 536, 564, 846 A.2d 353, 369–70 (2004); *Attorney Grievance Comm'n v. Awuah*,

---

4. While this Court appreciates the diligence by which this judge and all of the other judges approach their tasks in finding the facts and making conclusions of law and identifying mitigating and aggravating circumstances in Attorney Grievance matters, we encourage them to refrain from making recommendations regarding sanctions, no matter how much a party entreats them to do so. *See* Md. Rule 16–752(a) (defining the authority of Court of Appeals to enter an order designating a circuit court judge to conduct an evidentiary hearing); *id.* at 16–757(c) (defining the duties of the hearing judge, but including no authority to recommend sanctions).

374 Md. 505, 520, 823 A.2d 651, 660 (2003); *Attorney Grievance Comm'n v. Jaseb,* 364 Md. 464, 475, 773 A.2d 516, 522 (2001); *Attorney Grievance Comm'n v. Glenn,* 341 Md. 448, 470, 671 A.2d 463, 473 (1996). From our independent review of the record, any conclusions of law made by the hearing judge are subject to our de novo review. *Mininsohn,* 380 Md. at 564, 846 A.2d at 370 (2004); *Awuah,* 374 Md. at 520, 823 A.2d at 660.

Respondent took exception to the hearing judge's conclusion of law. She excepts to Judge Martin's conclusion that "her failure to inform the Federal Trade Commission of her marriage to Mr. Iverson constituted a deliberate omission of material fact in violation of Rule 8.4(c) of the Maryland Rules of Professional Conduct." Respondent asserts that 5 U.S.C. § 2302(b)(1)(E)[5] and 5 C.F.R. § 720.901(a)[6] "specifically, unequivocally and unqualifiedly" prohibit a federal agency, during the employment process, from considering marital status.

██ The sole question before us therefore, is whether Respondent, in proffering a letter from her husband, who did not share the same surname, in support of an increase in salary from that which she had been offered by the Commission, engaged in "conduct involving dishonesty, fraud, deceit or misrepresentation," Rule 8.4(c), when in so doing led the Commission to believe that she had "purely an employer-employee" relationship with her husband, Mr. Iverson. We agree with Judge Martin that Respondent violated Rule 8.4(c)

---

**5.** 5 U.S.C. § 2302(b)(1)(E) (2000) provides:

> Any employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority ... discriminate for or against any employee or applicant for employment ... on the basis of marital status or political affiliation, as prohibited under any law, rule, or regulation[.]

**6.** 5 C.F.R. § 720.901(a) states:

> In determining the merit and fitness of a person for competitive appointment or appointment by noncompetitive action to a position in the competitive service, an appointing officer shall not discriminate on the basis of the person's political affiliations, except when required by statute, or on the basis of marital status[.]

when she "deprived the Commission of information material to its ability to make an appropriate assessment of Mr. Iverson's recommendation and job offer."

In the present case, as the hearing judge found, Respondent did not *"explicitly "* misstate any fact but rather, concealed a material fact that she had a relationship of significance with the person who penned the letter that she intentionally submitted in support of her petition for a higher salary. The hearing judge found that the correspondence at issue, which was written on office stationary addressed to Respondent at her home address that she shared with her husband, included the appellation "Dear Ms. Floyd" with language suggesting that the salary referenced therein would be subject to "renegotiation," and concluded with the sentence stating, "Regardless of where your future employment decisions take you, I wish you the best of luck in your career," was intended to conceal a relationship other than that of an employer and employee. Judge Martin cogently noted that Respondent also omitted from her résumé any reference to her employment with Mr. Iverson before she and he relocated to the District of Columbia, although other non-legal employment prior to that time was included.

■ Respondent concealed her relationship with her husband in her attempt to secure a higher starting salary from the Commission than she otherwise would have received. As the hearing judge noted, deceit can be based not only on overt misrepresentation but on concealment of material facts. *See Hoffman v. Stamper*, 385 Md. 1, 28 n. 12, 867 A.2d 276, 292 n. 12 (2005) ("It has long been clear that '[f]raud may consist in a suppression of the truth as well as in the assertion of a falsehood.' ") (citation omitted); *Parish v. Md. & Va. Milk Producers Ass'n*, 250 Md. 24, 72, 242 A.2d 512, 539 (1968) ("It is well established that actionable fraud may result from the concealment of material facts as well as from the false statement of material facts."); *Levin v. Singer*, 227 Md. 47, 64, 175 A.2d 423, 432 (1961) ("Where [ ] concealment effectively suppresses material facts with the object of creating or con-

tinuing a false impression, a cause of action based on fraud may arise."). While it is true that Respondent did not lie in her quest to gain a higher salary, her concealment led to a perception that she and Mr. Iverson stood at arms-length from one another, rather than as husband and wife, and as such, she encouraged a less-than accurate representation.[7] We agree with the District of Columbia Court of Appeals when it noted in another case involving an inaccuracy in the application process:

> In the first place Respondent had an ethical and professional obligation to furnish information that he knew to be accurate. The resume is usually the first significant information a prospective employer receives about a candidate; *its accuracy is essential.*

*In re Hadzi–Antich,* 497 A.2d 1062, 1065 (D.C.1985) (emphasis added). Further, the Supreme Court of Florida, when confronted with a situation in which a respondent concealed information about his criminal history on his résumé, determined that the concealment reflected a lack of good moral character and constituted "conduct which would cause a reasonable man to have substantial doubts about [his] honesty, fairness and respect for the rights of others and for the laws of the state and nation." *Florida Bar re Jahn,* 559 So.2d 1089, 1090 (Fla.1990) (citation omitted). *See also In re Wolmer,* 226 A.D.2d 77, 650 N.Y.S.2d 679, 680 (N.Y.App.Div.1996) (stating that submitting a false and misleading résumé and reference letter to several prospective employers, including exaggerating the amount of time he worked at prior positions and omitting other positions all together, was "serious" misconduct); *In re Norwood,* 80 A.D.2d 278, 438 N.Y.S.2d 788 (N.Y.App.Div.1981) (dishonest conduct for submitting false

---

7. *See* Connie Swemba, *To Tell the Truth, the Whole Truth, and Nothing but the Truth: Employment References and Tort Liability,* 33 U. Tol. L.Rev. 847, 850 (2002) ("[R]eliable references are necessary because prospective employers can make effective decisions that are more responsible during the hiring process when they have the advantage of an open, honest, and informative employment reference from a past employer."); *id.* at 852 ("[P]rospective employers need candid employment references to fit the right person to the right job.").

and misleading résumé to prospective employer); *In re Lavery*, 90 Wash.2d 463, 587 P.2d 157 (1978) (misconduct involving dishonesty and misrepresentation when attorney falsified his résumé, transcript, and letters of recommendation).

The fact that the Commission could not discriminate against Respondent on account of her marital status, as codified in 5 C.F.R. § 720.901(a) ("In determining the merit and fitness of a person for competitive appointment or appointment by non-competitive action to a position in the competitive service, an appointing officer shall not discriminate on the basis of the person's political affiliations, except when required by statute, or on the basis of marital status[.]"), is not in issue. Rather, regardless of whether Respondent and Mr. Iverson had been married, they enjoyed a close personal relationship, a material fact that Respondent should not have concealed when she voluntarily submitted the offer letter to the Commission. Her concealment of a close personal relationship with Mr. Iverson, in addition to that of employee and employer, impeded the ability of the Federal Trade Commission to question and evaluate the bona fides of what was proffered as a competing offer. Clearly, in an application for employment, the prospective employer is concerned about any potential bias of an author of a letter submitted by an applicant, whether such bias be social, intimate, or economic. In this case, Respondent engaged in "conduct involving dishonesty, fraud, deceit, or misrepresentation" in violation of Rule 8.4(c) when she concealed the nature of her relationship with Mr. Iverson in order to obtain a higher starting salary with the Federal Trade Commission.

## *SANCTION*

■ In the case *sub judice*, Respondent has violated Rule 8.4(c). Respondent asserts that because the hearing judge's conclusion of law was not supported by clear and convincing evidence, no sanction is appropriate and the action should be dismissed. Petitioner, on the other hand, recommends that Respondent be suspended for a period of ninety days because she has been found to have engaged in dishonest conduct by

concealing the fact that Mr. Iverson was not a disinterested reference. We agree with Bar Counsel.

■■■ As a general rule, the appropriate sanction for a violation of the Rules of Professional Conduct "depends on the facts and circumstances of each case, including consideration of any mitigating factors," *Attorney Grievance Comm'n v. Zuckerman*, 386 Md. 341, 375, 872 A.2d 693, 713 (2005), in furtherance of the purposes of attorney discipline: " 'to protect the public, to deter other lawyers from engaging in violations of the Maryland Rules of Professional Conduct, and to maintain the integrity of the legal profession.' " *Id.* (quoting *Awuah*, 374 Md. at 526, 823 A.2d at 663) (citations omitted). In *Attorney Grievance Comm'n v. Sheridan*, 357 Md. 1, 27, 741 A.2d 1143, 1157 (1999), we said:

> Because "an attorney's character *must remain beyond reproach*" this "Court has the duty, since attorneys are its officers, to insist upon the *maintenance* of the integrity of the bar and to prevent the transgressions of an individual lawyer from bringing its image into disrepute. Disciplinary proceedings have been established for this purpose, not for punishment, but rather as a catharsis for the profession and a prophylactic for the public."

(quoting *Attorney Grievance Comm'n v. Deutsch*, 294 Md. 353, 368–69, 450 A.2d 1265, 1273 (1982)) (citations omitted) (emphasis in original). When imposing sanctions, we have enunciated that, "[t]he public is protected when sanctions are imposed that are commensurate with the nature and gravity of the violations and the intent with which they were committed." *Attorney Grievance Comm'n v. Gore*, 380 Md. 455, 472, 845 A.2d 1204, 1213 (2004). Therefore, in this case we consider the nature of the ethical duty violated in light of any aggravating or mitigating circumstances. *Attorney Grievance Comm'n v. Sweitzer*, 395 Md. 586, 598–99, 911 A.2d 440, 447–48 (2006).

In *Attorney Grievance Comm'n v. Potter*, 380 Md. 128, 844 A.2d 367 (2004), we considered what sanction was appropriate for an attorney who deleted client records from his office

computer prior to leaving the firm's employ. We determined that Potter violated Rules 8.4(b), (c), and (d) and concluded that he should receive a ninety day suspension from the practice of law. We iterated that Potter had no prior disciplinary record, his misconduct was an isolated incident, and that his motive was to act in the best interests of his clients. *Potter*, 380 Md. at 162–63, 844 A.2d at 387–88.

In *Attorney Grievance Comm'n v. Maxwell*, 307 Md. 600, 516 A.2d 570 (1986), Maxwell, while representing two individuals charged with drug trafficking in Florida, delivered a deed to his client's bail bondsman, purporting to convey land on the Eastern Shore from Jaxon and Associates, Inc. to the bail bondsman's principal; the deed contained the signature of "Ronald Jaxon," and was witnessed and notarized by Maxwell. In fact, there was no such person as "Ronald Jaxon," and Maxwell had witnessed one of his clients sign under that name. Based upon these facts, the hearing judge concluded that Maxwell had engaged in misconduct involving misrepresentation and false statements in violation of Disciplinary Rules 1–102(A)(4),[8] the predecessor to Rule 8.4(c), as well as Rules 1–102(A)(1) and 7–102(A)(5).[9] For these indiscretions, we issued Maxwell a ninety day suspension. *Maxwell*, 307 Md. at 605, 516 A.2d at 572. In reaching this conclusion, we noted that although we could not "condone deliberate falsification of a solemn document by an experienced attorney," Maxwell had an unblemished disciplinary record, expressed remorse for his actions, and his conduct did not result in any actual harm:

---

**8.** Disciplinary Rule 1–102(A)(4) provided that "[a] lawyer shall not . . . [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation." Disciplinary Rule 1–102(A)(4) was the predecessor to Rule 8.4(c), which took effect when we adopted the Rules of Professional Conduct effective January 1, 1987.

**9.** Disciplinary Rule 1–102(A)(1) provided that "[a] lawyer shall not . . . [v]iolate a disciplinary rule"; Disciplinary Rule 7–102(A)(5) stated that "[i]n his representation of a client, a lawyer shall not . . . [k]nowingly make a false statement of law or fact."

"In cases where the improper conduct of the lawyer involved misrepresentation, the severity of the sanction to be imposed for the misconduct depends upon the facts and circumstances of the particular case." We have given careful consideration to those facts and circumstances. We recognize Maxwell's prior good record and his remorse, as well as the lack of actual harm in this case. Yet we cannot condone deliberate falsification of a solemn document by an experienced attorney. That this action was done to assist a client in obtaining bail, rather than for the lawyer's personal gain, does not exempt Maxwell from discipline. The imposition of a suspension from the practice of law furthers "the primary purpose of protecting the public by demonstrating the type of misconduct which this Court and the legal profession will not tolerate." We conclude that in order to protect the public from misconduct of this sort, a 90–day suspension is the proper sanction.

*Id.* (citations omitted).

In *Attorney Grievance Comm'n v. Haupt,* 285 Md. 39, 399 A.2d 1350 (1979), we addressed what the appropriate sanction was for an attorney who violated Disciplinary Rule 1–102(A)(4). During a visit with his client in lock-up, Haupt brought his client's fiancée with him, who he represented as his assistant when queried by an officer with the Sheriff's Department; the fiancée would not have been admitted to the lock-up if her true status had not been concealed. We determined that Haupt violated Rule 1–102(A)(4); given the dishonest nature of his misconduct and the fact that it constituted a second offense, we imposed a ninety day suspension. *Haupt,* 285 Md. at 44, 399 A.2d at 1353.

In *Prince George's County Bar Association v. Vance,* 273 Md. 79, 327 A.2d 767 (1974), Vance forged a form indicating that he had been assigned to active military duty in order to give him access to a Post Exchange, where he made several purchases ranging from $12 to $14, which allowed him to save roughly $1.00. Vance conceded that his conduct reflected deceit in violation of Disciplinary Rule 1–102(A)(4). Addressing the appropriate sanction to impose, we noted that although

Vance had expressed genuine remorse for his misconduct, which was an isolated instance and resulted in only minimal personal gain, the violation was still serious enough to warrant a ninety day suspension from the practice of law:

> Nor, however, is this properly a case for a bare reprimand, let alone an outright dismissal of these proceedings. Our earlier observations are largely dispositive here. However minimal the amount involved may have been, the inescapable fact remains that respondent's acts were the fruits of misrepresentation; moreover, they were studied, not impulsive. It is questionable whether conduct such as occurred here can ever be so lightly regarded as to result in no more than a mere reprimand. Though not committed in a professional capacity, the actions of respondent nevertheless reflect directly upon his fitness as an attorney[.] A reprimand, as the least severe sanction which may be imposed in a disciplinary proceeding, is clearly reserved for misconduct that is not affected with such deception as was exhibited here.
>
> In our considered judgment, the proper sanction to be applied here is a suspension of 90 days.

*Vance*, 273 Md. at 84–85, 327 A.2d at 770 (citation omitted).

■ Like in *Potter, Maxwell, Haupt* and *Vance,* Respondent's misconduct reflected dishonesty; she violated Rule 8.4(c) by intentionally concealing the nature of her relationship with Mr. Iverson from the Federal Trade Commission during her employment application process in order to obtain a higher salary. Moreover, we find it troubling that Respondent omitted from her résumé any reference to her employment with Mr. Iverson before she and he relocated to the District of Columbia, although non-legal employment prior to this time was included. We also, however, consider any mitigating factors when determining the appropriate sanction, to include:

> "absence of a prior disciplinary record; absence of a dishonest or selfish motive; personal or emotional problems; timely good faith efforts to make restitution or to rectify

consequences of misconduct; full and free disclosure to disciplinary board or cooperative attitude toward proceedings; inexperience in the practice of law; character or reputation; physical or mental disability or impairment; delay in disciplinary proceedings; interim rehabilitation; imposition of other penalties or sanctions; remorse; and finally, remoteness of prior offenses."

*Sweitzer,* 395 Md. at 599, 911 A.2d at 448 (quoting *Glenn,* 341 Md. at 488–89, 671 A.2d at 483 (1996)). In this case, Respondent has no prior disciplinary record, and the instant violation is not part of a pattern of misconduct. Additionally, she acknowledged her error. Considering all of the circumstances, Respondent's deceitful conduct warrants a ninety day suspension from the practice of law.

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715(c), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION.*