Attorney Grievance Commission of Maryland v. Sudha Narasimhan, Misc. Docket AG No. 77, September Term, 2012

**ATTORNEY DISCIPLINE – SANCTIONS – SIXTY-DAY SUSPENSION –** Court of Appeals suspended from practice of law in Maryland for sixty days lawyer who: (1) misrepresented legal experience on résumé and job proposal to gain employment and appear attractive to potential client; (2) established law practice with attorney in specific field without verifying his expertise and experience in field; (3) provided incompetent representation; and (4) failed to promptly, adequately, and fully respond to and inform client of client's case status and available options. Such conduct violated Maryland Lawyers' Rules of Professional Conduct ("MLRPC") 1.1 (Competence), 1.3 (Diligence), 1.4 (Communication Generally), 7.1 (Communications Concerning Lawyer's Services), 8.4(c) (Dishonesty, Fraud, Deceit or Misrepresentation), 8.4(d) (Conduct Prejudicial to the Administration of Justice), and 8.4(a) (Violating MLRPC).

IN THE COURT OF APPEALS

OF MARYLAND

Misc. Docket AG No. 77

September Term, 2012

_____

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

SUDHA NARASIMHAN

_____

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

_____

Opinion by Watts, J.
Adkins, J., and McDonald, J. concur and
dissent.

_____

Filed: May 23, 2014

This attorney discipline proceeding concerns a Maryland lawyer who: (1) misrepresented her legal experience on her résumé and a job proposal to gain employment and appear attractive to a potential client; (2) established a law practice with an attorney in a specific field without verifying his expertise and experience in the field; (3) provided incompetent representation; and (4) failed to promptly, adequately, and fully respond to and inform a client of the client's case status and available options.

Sudha Narasimhan ("Narasimhan"), Respondent, a member of the Bar of Maryland, was retained by the District of Columbia Metropolitan Police Department ("the MPD") to secure a permanent residency for its employee, Dr. Laurie Samuel ("Dr. Samuel"), a Canadian citizen whom the MPD had hired as a project specialist to oversee a new program. Dr. Samuel filed a complaint against Narasimhan with the Attorney Grievance Commission of Maryland ("the Commission"), Petitioner.

On December 28, 2012, in this Court, Bar Counsel filed a "Petition for Disciplinary or Remedial Action" against Narasimhan, charging her with violating Maryland Lawyers' Rules of Professional Conduct ("MLRPC") 1.1 (Competence), 1.3 (Diligence), 1.4 (Communication Generally), 7.1 (Communications Concerning a Lawyer's Services), 8.4(a) (Violating MLRPC), 8.4(c) (Dishonesty, Fraud, Deceit or Misrepresentation), and 8.4(d) (Conduct Prejudicial to the Administration of Justice). On January 9, 2013, we referred this attorney discipline proceeding to the Honorable Eric M. Johnson ("the hearing judge") of the Circuit Court for Montgomery County ("the circuit court"). On June 3, 4, 5, and 6, 2013, the hearing judge conducted a hearing. On July 26, 2013, the hearing judge filed in this Court findings of fact and conclusions of law,

concluding that Narasimhan violated MLRPC 1.1, 1.3, 1.4(a) and (b), 7.1, 8.4(a), 8.4(c), and 8.4(d).

On March 10, 2014, we heard oral argument. For the below reasons, we suspend Narasimhan from the practice of law in Maryland for sixty days.

### I. Hearing Judge's Findings of Fact

In his opinion, the hearing judge found the following facts, which we summarize.

On June 11, 2007, this Court admitted Narasimhan to the Bar of Maryland. For the next year and a half, Narasimhan took temporary jobs at a personal injury firm and as a contract attorney completing document review. In January 2009, Narasimhan met Edmundo Gordon Rogers, Esquire ("Rogers") through an advertisement on the website Craig's List. Rogers represented that he was an experienced immigration attorney who had been practicing law for sixteen years. Eventually, Narasimhan and Rogers established The Immigration Law Group ("ILG") by executing a Joint Venture Master Agreement ("the Agreement"). Under the Agreement, Narasimhan was to be "primarily responsible for the conduct of the office, business development, control of finances, [and the] practice of law[,]" and Rogers was to provide "advice and legal expertise" and to research "legal issues that will arise in the conduct of the law practice." Under the Agreement, Narasimhan and Rogers were to equally share ILG's profits.

In 2009, the MPD sought an immigration attorney to assist in securing permanent residency for its employee, Dr. Samuel, through the completion of the EB-2 Permanent Residency process. Dr. Samuel, a Canadian citizen who was in the United States pursuant to a work visa that would not lead to permanent residency, had been hired by the

MPD as a project specialist tasked with overseeing a new program. On November 4, 2009, only three months after forming ILG, Narasimhan, on behalf of ILG, answered the MPD's request for a proposal seeking representation for Dr. Samuel by submitting a Request for Quotation, Proposal, her résumé, and Rogers's résumé.

In the Proposal, Narasimhan stated that she was "well-versed" in, and had "a good knowledge of[,] the immigration laws." In her résumé, Narasimhan stated that she had represented "immigration clients in documentary immigration processes and litigation" and had "handled Family petitions and Citizenship applications." Significantly, though, Narasimhan had never: (1) represented clients in the "documentary immigration processes"; (2) represented clients in immigration litigation; or (3) "handled Family petitions and Citizenship applications." Thus, Narasimhan's résumé contained several misrepresentations about her legal experience.

The MPD chose ILG to assist in establishing permanent residency for Dr. Samuel based on Rogers's experience and Narasimhan's ability to provide local services as a member of the Bar of Maryland. ILG was to be paid a total of $2,800 for the representation, which was to commence on November 20, 2009. ILG's primary liaison at the MPD was Diane Haines Walton ("Haines"), the MPD's Director of Human Resources; Haines authorized Narasimhan to speak with Dr. Samuel about the representation.

Shortly after the MPD selected ILG, Narasimhan traveled to India, where she

remained from December 3, 2009, until January 31, 2010.[1]  Narasimhan was "largely unavailable" during the time that she was in India and asked Rogers to "take the lead" on the representation while she was out of the country.

On December 10, 2009, a conference call was held; Narasimhan did not participate in the conference call.  The hearing judge determined that the December 10, 2009, conference call "would eventually prove to be essential."  Narasimhan did not respond to the MPD's request for a second conference call on December 21, 2009.

On January 20, 2010, Narasimhan advised the MPD that ILG was ready to file "Form 9089"[2] online "next week."  Narasimhan failed to file Form 9089 online, however, and gave no explanation for the failure.  Between February 1, 2010, and March 15, 2010, Narasimhan, Rogers, and Dr. Samuel prepared multiple paper drafts of Form 9089.  On March 23, 2010, Narasimhan mailed an incomplete and incorrect version of Form 9089 to the Department of Labor ("the DOL").  On April 2, 2010, Narasimhan submitted an invoice to the MPD for $1,800 for filing Form 9089.  On or about May 27, 2010, the Government of the District of Columbia paid the invoice.[3]

On April 15, 2010, Dr. Samuel e-mailed Narasimhan and Rogers a series of

---

[1]The hearing judge stated that Narasimhan left for India shortly after the representation commenced, on December 3, 2010.  It is clear that this was a typographical error and that Narasimhan left for India on December 3, 2009.

[2]Form 9089, the Application for Permanent Employment Certification, must be filed with the Department of Labor as part of the permanent residency application process.

[3]Although the hearing judge stated that the invoice was paid on or about May 27, 2009, it is clear that this was a typographical error and that the invoice was paid on or about May 27, 2010.

questions concerning the labor certification process and requested available options, as her work visa would expire in January 2011. Narasimhan replied to Dr. Samuel's e-mail, assuring her that Rogers would provide answers to her questions. Narasimhan did not answer any of Dr. Samuel's questions, but instead asked Rogers to respond "ASAP." On or about April 26, 2010, Dr. Samuel telephoned Narasimhan and left a voicemail stating that she had not received any substantive answers to her questions. Narasimhan thereafter advised Dr. Samuel that the delay was due to Rogers's travel schedule and other assignments. On May 2, 2010, Rogers provided a partial response to Dr. Samuel's e-mail.

In a letter dated May 3, 2010, the DOL advised the MPD that it was denying certification of Form 9089. Almost all the reasons for denial by the DOL were the result of Narasimhan's failure to: (1) adequately inform the MPD of the requirements of the recruitment process; (2) obtain the necessary information to complete Form 9089; and (3) file the correct version of Form 9089 with the information she had obtained. Even if Narasimhan had mailed the correct version of Form 9089, the DOL still would have denied certification because of substantial omissions and misinformation.

On May 8, 2010, Narasimhan and Rogers met with Dr. Samuel and Haines to discuss the denial letter and Dr. Samuel's options. At the meeting, Narasimhan advised the MPD that a corrected Form 9089 could be filed with the DOL. On May 12, 2010, Narasimhan, for the first time, filed Form 9141, requesting a prevailing wage determination. The DOL requires that Form 9141 be completed prior to, and as part of, the submission of Form 9089. On May 27, 2010, at the request of Dr. Samuel and the

MPD, Narasimhan submitted a handwritten Form 9089 that Dr. Samuel had completed. On June 3, 2010, Narasimhan filed a typewritten Form 9089 with the DOL to "clarify any illegible section or portions of the handwritten document." On June 8, 2010, Narasimhan mailed a letter to the DOL requesting review of the May 3, 2010, denial of certification. On June 21, 2010, Narasimhan mailed another letter to the DOL regarding the refiled Form 9089 and request for review.

On June 15, 2010, and July 14, 2010, Haines and Dr. Samuel, respectively, requested information from ILG about obtaining a one-year extension to Dr. Samuel's current work visa. Neither Haines nor Dr. Samuel received a response from Narasimhan or Rogers with information regarding an extension of Dr. Samuel's current work visa.

In June 2010, the MPD received a second invoice from ILG. At that time, the MPD advised Narasimhan that it would not pay for additional work related to the refiling of Form 9089 that resulted from her errors and omissions. In response, Narasimhan submitted a modified invoice.

On July 14, 2010, Dr. Samuel and Haines requested a conference call with Narasimhan and Rogers to receive an update on the status of the case and to discuss the appeals process. The requested conference call never occurred, and neither Dr. Samuel nor the MPD was provided with the requested information concerning the appeals process. On July 20, 2010, the MPD sent an e-mail terminating ILG's representation.

In September 2010, the DOL again denied Dr. Samuel's certification. On November 15, 2011, the Board of Labor Certification Appeals affirmed denial of the certification.

Before the hearing judge, the Commission called Michael L. Kabik, Esquire ("Kabik") as an expert in immigration law. Kabik opined, with a reasonable degree of professional certainty, that Narasimhan lacked the necessary and required legal knowledge, skill, thoroughness, and preparation to represent the MPD. Kabik further opined that the MPD was unable to make informed decisions regarding the permanent residency process due to Narasimhan's failure to adequately explain the representation and the residency process. The hearing judge credited Kabik's opinions.

## II. Evidence Adduced at the Hearing

The following evidence was adduced at the hearing of June 3-6, 2013.

The Proposal and Narasimhan's résumé were admitted into evidence.[4] In the Proposal, Narasimhan described herself as follows: "Being an immigrant [myself, I am] well-versed and ha[ve] a good knowledge of the immigration laws in this country[.]"[5] In

---

[4]At the hearing, providing additional information about her background, Narasimhan testified that she was born August 21, 1975. Thus, at the time the complaint was filed in December 2011, Narasimhan was thirty-six years old. Narasimhan testified that prior to law school she had obtained a "bachelor's of commerce degree" and a "diploma in computer application systems[.]" Narasimhan testified that she had worked in database programming and as a "webmaster," editing a website for an organization. Narasimhan testified that prior to law school she had also served as the office manager of a law firm.

[5]During the proposal process, Narasimhan communicated with a contract specialist from the District of Columbia Office of Contracting & Procurement. In an e-mail dated November 13, 2009, Narasimhan advised the contract specialist as follows:

The attorney named as DC contact is ME. I have knowledge of Immigration law and have worked on a couple of Family petitions and Citizenship applications. . . .

The principal point of contact with the g[overnment] will be ME.

her résumé, under her job description with ILG, Narasimhan stated that she had represented "Immigration clients in documentary immigration processes and litigation" and had handled "Family petitions and Citizenship applications." Specifically, Narasimhan's job description with ILG appeared on her résumé as follows:

**EXPERIENCE**

**THE IMMIGRATION LAW GROUP (A Joint Venture)**, Alexandria, VA
Attorney/Joint Venturer, July 20, 2009 – Present
Representation of Immigration clients in documentary immigration processes and litigation. Handled Family petitions and Citizenship applications.[6]

Before the hearing judge, Narasimhan testified that the job description under ILG stating "Representation of immigration clients, and documentary immigration processes and litigation" was not intended to describe her job experience, but instead "was the description of [ILG] and what it was formed to do" and was meant to be a prospective statement of the work she anticipated ILG to complete. When asked whether she informed anyone at the MPD that her "intention with that first sentence on [her] r[é]sum[é] was p[ro]spective and [] didn't reflect any actual experience that [she] had[,]" Narasimhan answered that she "assumed they knew already[.]"

Narasimhan testified that, at the time she submitted her résumé to the MPD, ILG had not handled any matters that had resulted in litigation. Narasimhan admitted that there is no such thing as a "Citizenship application" as stated on her résumé, and that "[w]hat [she] meant in layman terms is basically an N-400 Application for

---

[6]Thereafter, Narasimhan listed other legal positions which she had held and described her job duties for each position.

Naturalization." Narasimhan testified that she had handled only two Applications for Naturalization, one in 2007 and one in 2008, both before she formed ILG. When asked why she listed that she had experience with "Citizenship applications" under her job description with ILG, Narasimhan stated: "Because it was immigration experience, it was related experience, and my intent was to communicate the nature of my limited immigration experience in layman's terms basically." Narasimhan explained that the two Applications for Naturalization she had completed were done for her friends, and that she never received compensation for her work, was not retained by the individuals, and never entered her appearance with any government agency related to the applications. As to the statement on her résumé that she had handled "Family petitions," Narasimhan admitted that she had completed only one family petition and that the plural word "petitions" on her résumé "was a typo." Narasimhan admitted that the family petition that she listed on her résumé was actually prepared by Rogers, and her assistance was clerical.

On November 30, 2009, after ILG's representation of the MPD commenced, Narasimhan sent an e-mail to Haines outlining the "labor certification steps." Narasimhan's e-mail was forwarded to Rogers, who sent a reply e-mail to Narasimhan, stating: "This is good [Narasimhan]. Well done. I like your prompt response and dedication to customer service." These two e-mails were admitted into evidence.

As to the December 10, 2009, conference call in which Narasimhan did not participate, the hearing judge admitted into evidence an exchange of e-mails among Rogers, Haines, Dr. Samuel, and Narasimhan ranging from December 8, 2009, through December 10, 2009. In an e-mail dated December 8, 2009, Rogers provided Haines with

a brief outline of the EB-2 permanent residency classification and requested "some necessary information" to be discussed during the December 10, 2009, conference call, including Dr. Samuel's professional and academic background and her current job description. Narasimhan was copied on the e-mail. The following day, Haines e-mailed Rogers, Narasimhan, and Dr. Samuel, and advised that she would be sending documents requested by Rogers, including a job description, copy of a proposed advertisement to be placed in a local newspaper, and a statement of work outlining Dr. Samuel's duties. On December 10, 2009, Narasimhan responded that she would be unable to join the conference call, but stated that Rogers would share "both his and my thoughts[.]"

The hearing judge admitted into evidence an e-mail sent by Haines after the conference call occurred, memorializing the topics discussed during the call. In the e-mail, Haines wrote that, among other things: (1) Rogers stated he would "review employment ads submitted by prior clients to see if the employment ad [that the MPD] sent [him] is sufficient"; (2) the parties had "discussed the interview process and whether [the MPD] can share the names of applicants who apply for jobs"; (3) Dr. Samuel had already completed Form 9089; and (4) Dr. Samuel would send information and documents for review.

The hearing judge admitted into evidence a May 3, 2010, letter, in which the DOL advised the MPD that it was denying certification of Form 9089, and provided the following reasons for the denial: (1) six different items were incomplete on the application, including boxes to identify the occupation title and prevailing wage; (2) Form 9089 indicated that no notice of filing for a permanent employment certification

- 10 -

application was posted in a conspicuous location at the place of employment for ten business days; and (3) the newspaper advertisement placed by the MPD was not placed on a Sunday.

The hearing judge admitted into evidence a February 2, 2012, letter, in which Narasimhan replied to Bar Counsel's request for a response to Dr. Samuel's complaint by denying any violation of the MLRPC and stating the following:

> Throughout the period that I represented the MPD, I consulted repeatedly with [] Rogers in order to check my conclusions, obtain his review of the documents, and the like, before I communicated advice to the MPD.
>
> * * *
>
> [] On the same day that ILG received the contract for legal services from the MPD, I sent a detailed e[-]mail of the Labor certification process to the MPD[.]
>
> * * *
>
> [] I, in conjunction with [] Rogers, worked with Dr. Samuel to complete the initial Form 9089 in four review cycles[.]

### III. Standard of Review

In an attorney discipline proceeding, this Court reviews for clear error the hearing judge's findings of fact, and reviews without deference the hearing judge's conclusions of law. See Md. R. 16-759(b)(1) ("The Court of Appeals shall review de novo the circuit court judge's conclusions of law."); Md. R. 16-759(b)(2)(B) ("The Court shall give due regard to the opportunity of the hearing judge to assess the credibility of witnesses."); see also Attorney Grievance Comm'n v. Fader, 431 Md. 395, 426-27, 66 A.3d 18, 36-37 (2013).

## IV. Discussion

### A. Exceptions

The Commission filed no exceptions to the hearing judge's findings of fact and conclusions of law.

Narasimhan filed "Recommendations and Exceptions" taking exception to certain findings of fact and the hearing judge's conclusions that she violated MLRPC 1.3, 1.4(a) and (b), 7.1, and 8.4(c) and (d). For the below reasons, we overrule Narasimhan's exceptions, determine that the hearing judge's findings of fact are not clearly erroneous, and uphold all of the hearing judge's conclusions of law.

### B. Violations of MLRPC

### MLRPC 1.1 (Competence)

"A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." MLRPC 1.1. "Compliance with [MLRPC 1.1] requires more than knowing what to do. It requires applying the knowledge to the client's problem. . . . 'Evidence of a failure to apply the requisite thoroughness and/or preparation in representing a client is sufficient alone to support a violation of [MLRPC] 1.1.'" Attorney Grievance Comm'n v. McCulloch, 404 Md. 388, 397-98, 946 A.2d 1009, 1015 (2008) (quoting Attorney Grievance Comm'n v. Guida, 391 Md. 33, 54, 891 A.2d 1085, 1097 (2006)); see also Attorney Grievance Comm'n v. Brady, 422 Md. 441, 457, 30 A.3d 902, 911 (2011) ("The finding of a violation [of MLRPC 1.1] does not depend upon a showing that the attorney lacked the requisite legal knowledge. Rather, it can be

established by evidence that the attorney was not sufficiently thorough or prepared." (Citations omitted)).

Comment [2] to MLRPC 1.1 recognizes, however, that a lawyer need not have been in practice for years to be competent to handle a legal matter; specifically, Comment [2] provides:

> A lawyer need not necessarily have special training or prior experience to handle legal problems of a type with which the lawyer is unfamiliar. A newly admitted lawyer can be as competent as a practitioner with long experience. Some important legal skills, such as the analysis of precedent, the evaluation of evidence and legal drafting, are required in all legal problems. Perhaps the most fundamental legal skill consists of determining what kind of legal problems a situation may involve, a skill that necessarily transcends any particular specialized knowledge. A lawyer can provide adequate representation in a wholly novel field through necessary study. Competent representation can also be provided through the association of a lawyer of established competence in the field in question.

This Court has cautioned lawyers undertaking legal work in an unfamiliar field to "take careful thought as to their competence to practice in 'specialty' areas[.]" Attorney Grievance Comm'n v. Kendrick, 403 Md. 489, 515, 943 A.2d 1173, 1187 (2008) (citation and internal quotation marks omitted). Where "an attorney 'plunges into a field in which he or she is not competent, and as a consequence makes mistakes that demonstrate incompetence, the [MLRPC] demands that discipline be imposed[.]'" Id. at 515, 943 A.2d at 1187-88 (citation omitted).

Here, clear and convincing evidence supports the hearing judge's conclusion that Narasimhan violated MLRPC 1.1. It is evident that Narasimhan lacked the necessary experience in, and knowledge of, immigration law and procedure to competently represent the MPD at the time she was retained. Before forming ILG with Rogers, only a

- 13 -

few months prior to the MPD's retaining ILG, Narasimhan had not worked in immigration law; her experience was limited to two discrete applications for naturalization performed for friends and providing clerical assistance to Rogers on a family petition. Narasimhan's lack of competence was demonstrated by her submission of an incomplete version of Form 9089 to the DOL. The DOL explained that one of the reasons for denial of certification of Form 9089 was that the form was incomplete; *i.e.*, there were six different items left incomplete or blank on the form, including boxes to identify the occupation title and prevailing wage. The hearing judge determined that Narasimhan's failure to obtain the necessary information to complete Form 9089 directly led to the DOL's denial of certification. The evidence adduced at the hearing supports this finding. The record demonstrates that Narasimhan's lack of competence led to the denial of certification because she not only lacked the necessary expertise to complete and file the form, but also was not sufficiently prepared to submit a completed form. Compounding the errors, Narasimhan failed to file Form 9141, requesting a prevailing wage determination, prior to submitting Form 9089, as required by the DOL.

Although an attorney can provide competent representation through association with an attorney "of established competence in the field in question[,]" MLRPC 1.1 cmt. [2], such was not the case here. To begin, setting aside any issue as to Narasimhan's competence, or lack thereof, as the hearing judge concluded, Narasimhan failed to ascertain whether Rogers was, in fact, competent in the field of immigration law. As Narasimhan's counsel acknowledged at oral argument, the record reveals that Narasimhan's "vetting" of Rogers consisted solely of the following: meeting with

- 14 -

Rogers; verifying that Rogers was a member of good standing of the Bar of Arkansas; and assisting Rogers during public seminars on immigration law. Thus, Narasimhan failed to examine Rogers's qualifications or to verify his qualifications and claims of expertise through any third party.[7]

In any event, regardless of Rogers's qualifications, it is evident that Narasimhan accepted responsibility for the MPD's representation. In the ILG Agreement, Narasimhan agreed to be "primarily responsible for the . . . practice of law." Narasimhan advised the MPD during the proposal process that she–not Rogers–would be the attorney named as the District of Columbia contact and the "principal point of contact with the" government. During Bar Counsel's investigation of Dr. Samuel's complaint, Narasimhan responded, in writing, that she had "represented the MPD[.]" Narasimhan–not Rogers– submitted the Form 9089. Also, the record demonstrates that the initial communication after the MPD retained ILG came from Narasimhan, who e-mailed Haines an outline of the "labor certification steps."[8]

---

[7]We need not set forth a bright-line rule as to what would qualify as properly ascertaining an attorney's "established competence," as each case is fact-specific. Needless to say, in this case, Narasimhan took little action to verify Rogers's espoused qualifications.

[8]Interestingly, Rogers responded to Narasimhan concerning her e-mail to Haines: "This is good [Narasimhan]. Well done. I like your prompt response and dedication to customer service." We agree with Bar Counsel that this response leads to the conclusion that Narasimhan provided the outline of the "labor certification steps" without consulting Rogers.

Further, a review of Haines's testimony reveals that when asked by Bar Counsel whether the contract was awarded to Rogers, Haines testified that the MPD's contract was awarded to ILG, not Rogers. The ILG Agreement stated that Narasimhan and (Continued...)

Given the above circumstances, we have no difficulty in concluding that Narasimhan, not Rogers, was responsible for representing the MPD. As such, Narasimhan was required, under the MLRPC, to provide competent representation utilizing "the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." MLRPC 1.1. The hearing judge correctly concluded that Narasimhan failed to do so. So accurate is this conclusion that, at oral argument, Narasimhan's counsel conceded that the violation of MLRPC 1.1 "is established because, ultimately, the client did not receive the quality of representation that [Narasimhan] had hoped for and intended." For the above reasons, we conclude that the violation of MLRPC 1.1 has been established by clear and convincing evidence.[9]

### MLRPC 1.3 (Diligence)

Narasimhan excepts to the hearing judge's determination that she violated MLRPC 1.3, and contends that she responded promptly and diligently to communications from Haines and Dr. Samuel. Narasimhan asserts that she "responded promptly to all

Rogers were equal partners. And, a review of Haines's testimony reveals that she at no time testified that it was her understanding that Rogers was "lead counsel."

[9]The Dissent posits that it "fear[s] the implications of holding young lawyers accountable, in the *disciplinary context*, for the negligence or inattention of more experienced lawyers who supervise them." Dissent Slip Op. at 8 (footnote omitted) (emphasis in original). MLRPC 5.2(a) explicitly provides that "[a] lawyer is bound by the [MLRPC] notwithstanding that the lawyer acted at the direction of another person." In addition, this Court recently reiterated: "[E]very lawyer is presumed to know and abide by the MLRPC." Attorney Grievance Comm'n v. Davy, 435 Md. 674, 714, 80 A.3d 322, 345 (2013) (citation and internal quotation marks omitted). Each attorney is responsible for ensuring his or her own compliance with the MLRPC. In this case, to the extent that Rogers's conduct played a role in the violation, such a fact could be considered in determining the appropriate sanction, but would not affect whether or not Narasimhan violated a particular MLRPC.

inquiries by facilitating communication with her more experienced colleague[, Rogers].”

   “A lawyer shall act with reasonable diligence and promptness in representing a client.”  MLRPC 1.3.  For example, an attorney violates MLRPC 1.3 by failing to keep a client informed as to the status of the case and by failing to respond to the client’s inquiries.  See Attorney Grievance Comm’n v. Park, 427 Md. 180, 192, 46 A.3d 1153, 1160 (2012) (“[The lawyer]’s failure to keep the [clients] informed as to the status of the applications and his failure to respond to the [clients’] inquiries both violate MLRPC 1.3.”  (Citation omitted)).

   Here, clear and convincing evidence supports the hearing judge’s conclusion that Narasimhan violated MLRPC 1.3.  The record unequivocally establishes that Narasimhan failed to respond to and/or communicate with Haines and Dr. Samuel on several occasions about important matters related to the MPD’s representation.  To begin, Narasimhan failed to participate in the first conference call on December 10, 2009.  Later, after the DOL denied certification of Form 9089, both Haines and Dr. Samuel requested information from ILG about obtaining a one-year extension to Dr. Samuel’s work visa.  Neither Narasimhan nor Rogers provided a response to Haines or Dr. Samuel regarding the requested information.  Haines and Dr. Samuel requested a conference call to receive an update on the status of the case and to discuss the appeals process.  The requested conference call did not take place, and neither Narasimhan nor Rogers provided the requested information concerning the appeals process.  Less than one week after the failed attempt to obtain information and a status update, the MPD terminated ILG’s representation.  Thus, there were multiple occasions on which Narasimhan failed

to respond at all to requests for information, and she also failed to provide a requested status update.  As to Narasimhan's claim that she responded by facilitating communication with Rogers, Narasimhan accepted primary responsibility for representing the MPD; as such, it was incumbent upon Narasimhan to provide the requested information herself or to ensure that Rogers responded in full.  Under these circumstances, we have no difficulty in concluding that Narasimhan's violation of MLRPC 1.3 is supported by clear and convincing evidence.

## MLRPC 1.4 (Communication Generally)

Narasimhan excepts to the hearing judge's determination that she violated MLRPC 1.4(a), and contends that she maintained communication with Haines and Dr. Samuel throughout ILG's representation of the MPD, including during the time she was in India.  Narasimhan specifically excepts to the hearing judge's finding of fact that she was "largely unavailable" during her trip to India.  Narasimhan argues that she did not violate MLRPC 1.4(b), that Rogers "provided virtually all of the legal advice rendered to the MPD[,]" and that the hearing judge erred in excluding her testimony as to the matters about which Rogers advised the MPD.

MLRPC 1.4 provides as follows:

(a) A lawyer shall:

> (1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(f), is required by these Rules;
> (2) keep the client reasonably informed about the status of the matter;
> (3) promptly comply with reasonable requests for information; and
> (4) consult with the client about any relevant limitation on the

lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the [MLRPC] or other law.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

Comment [5] to MLRPC 1.4 explains that "[t]he client should have sufficient information to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued . . . . Adequacy of communication depends in part on the kind of advice or assistance that is involved."

Here, clear and convincing evidence supports the hearing judge's conclusion that Narasimhan violated MLRPC 1.4(a). Narasimhan failed to keep the MPD informed about the status of the matter and failed to respond promptly, on multiple occasions, to requests for information, even though she had advised the MPD that she was the "principal point of contact" and would be the attorney "named as [the] DC contact[.]" Glaringly, Narasimhan failed to respond to requests made on June 15, 2010, and July 14, 2010, by Haines and Dr. Samuel, respectively, requesting information about obtaining a one-year extension to Dr. Samuel's current work visa. Specifically, on June 15, 2010, Haines sent a letter to Rogers at ILG's Maryland address raising concerns about the DOL's denial of certification and Narasimhan's work performance, and requesting an itemization of work related to the second filing of Form 9089. Haines testified that in response to the June 15, 2010, letter, she received an invoice, which was sent by e-mail from Narasimhan to Haines, charging for expenses related to filing the second Form 9089. Haines testified that she did not get an actual response to the June 15, 2010, letter except for an invoice. Consistent with Haines's testimony, the record does not

demonstrate that either Narasimhan or Rogers responded and addressed Haines's concerns. And, on July 14, 2010, Dr. Samuel sent an e-mail to Rogers and Narasimhan requesting: (1) that a conference call take place on July 16, 2010, with Haines; and (2) that certain information be provided, including an update on the case, the possibility of appeal, and the process of applying for an extension of Dr. Samuel's work visa. Narasimhan e-mailed Haines and Dr. Samuel advising that Rogers was out of the country and she would need to "see if [he was] available to talk" on July 16, 2010; Narasimhan provided no information concerning the possibility of an appeal, the process of obtaining an extension of the work visa, or an update on the case. Tellingly, less than one week later, on July 20, 2010, the MPD terminated ILG's representation.

Although Narasimhan specifically excepts to the hearing judge's finding that she was "largely unavailable" while in India, the record demonstrates the following: (1) Narasimhan failed to participate in the December 10, 2009, conference call, during which critical information–such as employment advertisements, information needed from Dr. Samuel, and the interview process–was discussed;[10] (2) Narasimhan failed to respond to

_____

[10]In an e-mail dated November 17, 2009, Narasimhan advised Rogers that she would be out of the country from December 3, 2009 to January 17, 2010. This e-mail was sent only to Rogers. The only support for Narasimhan having informed Haines of the trip is Narasimhan's own testimony at the hearing. Narasimhan testified before the hearing judge that, at some other point before the contract was awarded, she believed that she spoke with Haines during a conference call and advised Haines that she was going to India "for a family wedding in the month of December and January." Specifically, Narasimhan testified: "I believe I did tell [Haines] that I was basically going for a family wedding in the month on December and January." In the findings of fact, however, the hearing judge did not find that Narasimhan told Haines she would be out of the country from December 2009 through January 2010. As of the morning of the scheduled (Continued...)

- 20 -

the MPD's request for a second conference call on December 21, 2009; and (3) although advising the MPD on January 20, 2010, that Form 9089 would be ready to file online "next week," Narasimhan failed to file the form online and provided no explanation for the failure. Thus, the record establishes that, while Narasimhan was in India, she failed to communicate with the MPD and to complete promised work.

There is a dearth of case law addressing the lawyer's role as counselor under MLRPC 1.4(b). See Attorney Grievance Comm'n v. Rand, 429 Md. 674, 716, 57 A.3d 976, 1001 (2012) ("Rand's exception implicates the application of [MLRPC] 1.4 to the process of counseling a client. To our knowledge, this is our first foray into the role of a lawyer as counselor." (Paragraph break omitted)). In Rand, id. at 716-17, 57 A.3d at 1001, although the hearing judge determined that the attorney had violated MLRPC 1.4(b), we concluded that "the hearing judge erred in not viewing counseling [the client] as a process, which occurred over a period of time." We observed that our analysis needed to "take into account the entire interaction between [the attorney] and [the client] and the information that was communicated[.]" Id. at 717, 57 A.3d at 1001. Based on

---

December 10, 2009, call, it was anticipated that Narasimhan would participate in the call. Indeed, it was only on the morning of the December 10, 2009, conference call, that Narasimhan e-mailed Rogers, Haines, and Dr. Samuel from India informing them that she would be unable to join the conference call.

In an e-mail dated December 10, 2009, Haines advised Narasimhan, Rogers, and Dr. Samuel that they were "scheduled to speak again on December 21 at 2:00." The conference call did not occur. Despite being aware that the MPD expected a second conference call to occur on December 21, 2009, Narasimhan took no action with respect to the December 21, 2009, call until January 5, 2010, when she forwarded an e-mail to Rogers, Haines, and Dr. Samuel indicating that she was aware the call did not occur and inquiring how to proceed.

that guiding principle, we held that there was not clear and convincing evidence that the attorney violated MLRPC 1.4(b), as the attorney explained the consequences of failing to take a particular action at the time of the initial meeting with the client, and explained: "To parse out what an attorney counsels or fails to counsel, as to the consequences of a client's failure to act, at each meeting, without consideration of what had been counseled at earlier meetings, is to tread a dangerous path when addressing willful violations." Id. at 718, 57 A.3d at 1002.

The facts and circumstances of Rand are distinct from those in the instant case. Indeed, we know of no Maryland case presenting circumstances similar to those presented here–i.e., a hearing judge has determined that an attorney failed to provide accurate information and advice to a client to the extent reasonably necessary to permit the client to make informed decisions, but the attorney contends that a colleague allegedly provided adequate information and advice to the client. Nonetheless, we conclude that clear and convincing evidence supports the hearing judge's conclusion that Narasimhan violated MLRPC 1.4(b).

Here, following the guiding principle of Rand, we review the entire interaction between ILG and the MPD, and the information conveyed by Narasimhan and Rogers. The MPD retained ILG to handle the matter of Dr. Samuel's permanent residency process. On November 30, 2009, shortly after the representation commenced, Narasimhan sent Haines an e-mail detailing the "labor certification steps." On December 8, 2009, Rogers e-mailed Haines a brief outline of the EB-2 permanent residency classification. During the December 10, 2009, conference call, Rogers discussed the

process with Haines and Dr. Samuel. It is not clear whether the information conveyed by Narasimhan and Rogers was accurate or complete. After the initial advisements, Dr. Samuel requested additional information about the labor certification process and her options, as her work visa would expire in a matter of months. Significantly, Narasimhan did not answer any of Dr. Samuel's questions, but instead asked Rogers to respond. When Rogers eventually responded, he provided only a partial response. Later, both Haines and Dr. Samuel requested information about obtaining a one-year extension to Dr. Samuel's current work visa. After the DOL denied certification of Form 9089, on separate occasions, Haines and Dr. Samuel requested additional information and a conference call to receive an update on the case and to discuss the appeals process. Tellingly, neither Narasimhan nor Rogers responded to the requests for additional information and the conference call did not occur. The requests for additional information and available alternatives to permanent residency and the lack of an adequate response demonstrate that neither Narasimhan nor Rogers provided the MPD with accurate and complete information and advice sufficient to enable the MPD to make informed decisions.

Although Narasimhan argues that Rogers "provided virtually all of the legal advice rendered to the MPD[,]" it is undisputed that Narasimhan provided the initial outline to Haines of the "labor certification steps" and that she accepted responsibility for the MPD's representation, both through the ILG Agreement (in which she agreed to be primarily responsible for the practice of law) and by her own initial statements to the MPD (in which she advised she was the attorney "named as [the] DC contact" and the

"principal point of contact"). Because Narasimhan was the attorney responsible for the MPD's representation and the principal point of contact for the MPD, and as the attorney who submitted Form 9089, it was incumbent upon Narasimhan, not Rogers, to ensure that the MPD was fully advised with accurate information.[11]

---

[11]The hearing judge specifically found that, "[a]ccording to ILG's agreement, [Narasimhan] was named as the attorney primarily responsible for the 'practice of law' and for the 'clients of the Joint Venture.'" A review of the Agreement confirms the hearing judge's finding. Section 5.01 of the ILG Agreement, concerning the division of labor between Narasimhan and Rogers outlined Narasimhan's and Rogers's responsibilities as follows:

> The Parties agree that [Narasimhan] is in a better position to conduct the daily management of the Joint Venture. **[Narasimhan] shall be primarily responsible for** the conduct of the office, business development, control of the finances, **practice of law under this Joint Venture Agreement and, the making of court appearances for the Joint Ventures and the clients of the Joint Venture subject to the terms of this Agreement. [Narasimhan] shall use her best efforts to** obtain[] clients for the Joint Venture, retain[] clients in the Joint Venture, and **conduct her practice of law**, except in the case of [Narasimhan]'s separate agreements with outside counsel and/or independent attorneys, as part of this Joint Venture.

> The Parties hereby acknowledge that [Rogers] has the experience, legal knowledge and, the business acumen in the Joint Venture. **[Rogers] shall be primarily responsible for providing advice and legal expertise to the Joint Venture.** [Rogers] shall also be primarily responsible for research of legal issues that will arise in the conduct of the law practice within the Joint Venture. [Rogers] shall, as circumstances permit, make court appearances for the clients of the Joint Venture.

(Emphasis added). In addition to the Agreement, Narasimhan's own conduct and statements support the hearing judge's finding that she was primarily responsible for the practice of law. During the representation, Narasimhan–not Rogers–submitted Form 9089. During Bar Counsel's investigation of Dr. Samuel's complaint, Narasimhan responded, in writing, among other things, that she had "represented the MPD[.]" The quotation above specifically states that Rogers was to "be primarily responsible for providing advice and legal expertise to the Joint Venture" and that is what the hearing (Continued...)

- 24 -

Revealingly, when asked at oral argument whether the violations of MLRPC 1.3 and 1.4 were established, Narasimhan's counsel stated: "I do believe they are established in one . . . sense, I do.  In the sense that the quality of representation wasn't there." Narasimhan's counsel nevertheless argued that Narasimhan "was very responsive to client communications."  It is readily apparent, however, that on many occasions Narasimhan failed to promptly respond to communications from the MPD, to keep the MPD reasonably informed about the status of the case, and to provide information necessary for the MPD to make informed decisions during the representation.  In other words, we are satisfied that the violations of MLRPC 1.4(a) and (b) have been established by clear and convincing evidence.

## MLRPC 7.1 (Communications Concerning a Lawyer's Services) & MLRPC 8.4(c) (Dishonesty, Fraud, Deceit or Misrepresentation)

Narasimhan excepts to the hearing judge's determination that she violated MLRPC 7.1 and 8.4(c), and contends that she did not claim in her résumé to have extensive experience in immigration law.  Narasimhan asserts that she did not fabricate her credentials or otherwise misrepresent her legal experience with the intent of gaining employment.  According to Narasimhan, the inaccuracies in her résumé were immaterial and "do not even rise to the level of 'puffing.'"

MLRPC 7.1 provides, in relevant part:

judge found, *i.e.*, that Rogers was responsible for rendering advice to the joint venture–ILG–and Narasimhan was primarily responsible for the practice of law.

Because we determine that Narasimhan was responsible for representation of the MPD, we do not address whether the hearing judge erred in excluding her testimony concerning the matters on which Rogers advised the MPD.

- 25 -

A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services. A communication is false or misleading if it:

(a) contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading[.]

Something that is "material" is something "[o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential[.]" Black's Law Dictionary 998 (8th ed. 2004). In the context of contracts, "[a] misrepresentation is material if it would be likely to induce a reasonable person to manifest his [or her] assent, or if the maker knows that it would be likely to induce the recipient to do so." Restatement (Second) of Contracts § 162(2) (1981). In the context of torts, a "matter is material if (a) a reasonable [person] would attach importance to its existence or nonexistence in determining his [or her] choice of action in the transaction in question; or (b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his [or her] choice of action, although a reasonable [person] would not so regard it." Restatement (Second) of Torts § 538(2) (1977).

In attorney grievance proceedings, violations of MLRPC 7.1 may occur where an attorney omits pertinent information from his or her letterhead or business cards, or otherwise fails to advise clients that the attorney is not licensed to practice law in Maryland. See, e.g., Attorney Grievance Comm'n v. Alsafty, 379 Md. 1, 5-7, 838 A.2d 1213, 1216-17 (2003) (We held that a New York attorney violated MLRPC 7.1 by distributing, at various public locations, business cards that failed to indicate that the

attorney's practice was limited to federal courts, and otherwise gave the impression that the attorney was licensed to practice law in Maryland.); Attorney Grievance Comm'n v. Harris-Smith, 356 Md. 72, 86-87, 737 A.2d 567, 575 (1999) (We held that an attorney violated MLRPC 7.1 by generally failing to "advise prospective clients that she was not admitted to practice in Maryland and from her use of [a business] card, . . . [which gave] the [] Maryland address of [the attorney]'s office and thereby indicate[d] that she [was] a Maryland lawyer."); Attorney Grievance Comm'n v. Brown, 353 Md. 271, 290, 725 A.2d 1069, 1078 (1999) (We held that a Maryland attorney violated MLRPC 7.1 by using letterhead which included another attorney's name as co-counsel without indicating that the other attorney was not licensed to practice law in Maryland.).

MLRPC 8.4(c) provides: "It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]" Recently, in Attorney Grievance Comm'n v. Dore, 433 Md. 685, 707-08, 73 A.3d 161, 174 (2013), we stated "that dishonesty and misrepresentation under [MLRPC] 8.4(c) have no requirement of intent to deceive." In Dore, id. at 708, 73 A.3d at 174, we explained that "there is a distinction between fraud and deceit on the one hand, and dishonesty and misrepresentation on the other hand[,]" stating:

> In *Attorney Grievance Commission v. Reinhardt*, for example, we stated that an intent to deceive is only relevant if Bar Counsel alleges fraud or deceit: "assuming that Bar Counsel alleged that an attorney engaged in fraudulent conduct, evidence as to an attorney's specific intent [to deceive] would be relevant and properly considered in assessing whether [MLRPC] 8.4(c) was violated." 391 Md. 209, 221, 892 A.2d 533, 540 (2006). To the contrary, we made clear that the "specific intent is not a necessary ingredient of dishonesty or misrepresentation." *Id.* at 222, 892 A.2d at 540. . . .

In *Attorney Grievance Commission v. Siskind*, this Court relied on *Reinhardt* and made clear that there is a distinction between "pure acts" and "false statements." 401 Md. 41, 70, 930 A.2d 328, 345 (2007). We explained that for "acts" alleged to be "fraudulent or deceitful," a "specific intent is typically necessary to be proven to demonstrate that the conduct in question was fraudulent in fact." *Id.* To the contrary, for "false statements" alleged to be dishonest or a misrepresentation, "there is no additional intent element, specific or otherwise, to prove." *Id.* Accordingly, in the context of [MLRPC] 8.4(c), so long as an attorney knowingly makes a false statement, he necessarily engages in conduct involving misrepresentation. No intent to deceive is necessary. *See also Attorney Grievance Comm'n v. Whitehead*, 405 Md. 240, 258, 950 A.2d 798, 809 (2008).

(First alteration in original).

Here, clear and convincing evidence supports the hearing judge's conclusion that Narasimhan violated MLRPC 7.1 and 8.4(c) by submitting to the MPD a résumé and proposal that contained multiple misrepresentations concerning her immigration law experience. The misrepresentations on Narasimhan's résumé were not minor or slight exaggerations. The record amply demonstrates that the misrepresentations were material misrepresentations and that certain statements on the résumé were wholly fabricated. It is undisputed that statements on Narasimhan's résumé and in the job proposal were not accurate as to her immigration law experience. At oral argument, Narasimhan's counsel admitted that "[t]here were misstatements[.]" In the proposal submitted to the MPD, Narasimhan described herself as follows: "Being an immigrant [my]self, [I am] well-versed and ha[ve] a good knowledge of the immigration laws in this country[.]" In her résumé, Narasimhan described her position with ILG as an "Attorney/Joint Venturer" as follows: "Representation of Immigration clients in documentary immigration processes and litigation. Handled Family petitions and Citizenship applications."

These descriptions were false and did not accurately describe Narasimhan's immigration law experience. Before the hearing judge, Narasimhan testified that the job description under ILG stating "Representation of immigration clients, and documentary immigration processes and litigation" was not her job experience with ILG, but rather "was the description of [ILG] and what it was formed to do" and was meant to be a prospective statement of the work that she anticipated ILG would complete. When asked whether she had informed anyone at the MPD that her "intention with that first sentence on [her] r[é]sum[é] was p[ro]spective and [] didn't reflect any actual experience that [she] had[,]" Narasimhan answered that she "assumed they knew already[.]" Narasimhan admitted that, at the time she submitted her résumé to the MPD, ILG had not had any matters that resulted in litigation.

As to the statement on the résumé–"Handled Family petitions and Citizenship applications"–Narasimhan conceded that there is no such thing as a "Citizenship application," and that what she "meant in layman terms is basically an N-400 Application for Naturalization." At the hearing, Narasimhan acknowledged that she had handled only two Applications for Naturalization, one in 2007 and one in 2008, both before she formed ILG with Rogers; *i.e.*, it was not accurate as she had stated that she handled "Citizenship applications" while with ILG. Moreover, the two Applications for Naturalization that Narasimhan had completed were done in a non-professional setting–she completed the applications for friends, never received compensation for her work, was not retained by the individuals, and never entered her appearance with any government agency related to the applications. When asked why she listed that she had experience with "Citizenship

applications" under her job description with ILG, Narasimhan's explanation was "[b]ecause it was immigration experience, it was related experience, and [her] intent was to communicate the nature of [her] limited immigration experience in layman's terms[.]" Ironically, this explanation highlighted the falsity of Narasimhan's statement in the proposal wherein she described herself as "well-versed" in, and having "a good knowledge of[,] the immigration laws[.]" As to the statement that she had handled "Family petitions," Narasimhan admitted that she had completed only one family petition and offered that the plural word "petitions" "was a typo." Narasimhan acknowledged that the family petition she referenced was actually prepared by Rogers–not her–and that her assistance was clerical, not legal.

Thus, the hearing judge correctly concluded that Narasimhan's résumé and the proposal contained misrepresentations. The misrepresentations in Narasimhan's résumé and in the proposal concerned her immigration law experience, and made it seem as though she had much more experience and knowledge of immigration law than she actually had at the time that she undertook representation of the MPD.

We flatly reject Narasimhan's contention that the description of immigration law experience on her résumé reflected ILG's practice of representing immigration clients. Reviewing the document as a whole, it is apparent that the description pertained to Narasimhan's experience and not to ILG's practice or mission. Tellingly, the résumé purports to list Narasimhan's "Education" and "Experience"–not ILG's practice. The first position listed under "Experience" is Narasimhan's role as "Attorney/Joint Venturer" of ILG. Directly beneath that appears the description: "Representation of Immigration

clients in documentary immigration processes and litigation. Handled Family petitions and Citizenship applications." Thereafter, Narasimhan's previous legal positions and corresponding job descriptions are listed. The job descriptions for the other previous legal positions utilize the past tense (*i.e.*, "Conducted[,]" "prepared[,]" "drafted[,]" etc.). Put simply, we find no merit in Narasimhan's contention that the résumé contained information about ILG's practice.

Narasimhan raises an issue as to the materiality of the many misrepresentations. Although the term "material" has not been discussed explicitly in the context of a violation of MLRPC 7.1, it is evident that a "material" misrepresentation is one "[o]f such a nature that knowledge of the item would affect a person's decision-making[.]" Black's Law Dictionary 998 (8th ed. 2004). Materiality is gauged objectively, not subjectively, meaning that a court utilizes a reasonable person standard in evaluating materiality. See Restatement (Second) of Contracts § 162(2) (1981) ("A misrepresentation is material if it is likely to induce a reasonable person to manifest his [or her] assent[.]"); Restatement (Second) of Torts § 538(2)(a) (1977) (A fact "is material if [] a reasonable [person] would attach importance to its existence or nonexistence in determining his [or her] choice of action in the transaction in question[.]").

Here, we have no difficulty concluding that the misrepresentations contained in the résumé and proposal, purporting to describe Narasimhan's experience with and familiarity of immigration law, were material because a reasonable person would have viewed the claimed experience and familiarity as important to a decision as to whether to retain ILG. Stated otherwise, the MPD may not have retained ILG if it had known that

Narasimhan essentially had no immigration law experience whatsoever. Even if the MPD had hired ILG based, in large part, as Haines testified, on Rogers's experience and expertise, and did not necessarily rely on the statements in the résumé and proposal purporting to outline Narasimhan's immigration law experience, actual reliance on the misrepresentations is not a requirement for violation of MLRPC 7.1 or 8.4(c). Reliance and materiality are two distinct concepts, as something can be material but not relied upon, *i.e.*, a reasonable person could view knowledge of a matter as important in the decision-making process, but not explicitly rely upon knowledge of the matter. In this case, it is readily apparent that Narasimhan's misrepresentations were made to make her credentials appear attractive to the MPD and to gain employment, and were material.

Although Narasimhan correctly points out that the hearing judge determined she did not set out to purposely defraud or deceive the MPD, no intent to deceive is required to find a violation of MLRPC 7.1 or 8.4(c). The plain language of MLRPC 7.1 does not require that a misrepresentation be made with an intent to deceive. For a violation of MLRPC 7.1 to be established, a false communication need only contain "a material misrepresentation of fact or law[.]" MLRPC 7.1(a). As discussed above, the misrepresentations in the résumé and proposal were material misrepresentations concerning Narasimhan's immigration law experience. Similarly, pursuant to MLRPC 8.4(c), we have stated explicitly "that dishonesty and misrepresentation under [MLRPC] 8.4(c) have no requirement of intent to deceive." Dore, 433 Md. at 707-08, 73 A.3d at 174. Thus, a false statement need not be made "with the intent of deceiving anyone" "so long as an attorney knowingly makes a false statement[.]" Id. at 708, 73 A.3d at 174

- 32 -

(citations omitted). Here, as Narasimhan acknowledged before the hearing judge, the statements in her résumé describing her immigration law experience with ILG were inaccurate, *i.e.*, they were false and did not describe her actual immigration law experience. That is all that is required to demonstrate the violation of MLRPC 8.4(c).

In sum, we conclude that clear and convincing evidence established that Narasimhan made material misrepresentations concerning her immigration law experience on her résumé and in the proposal. Although Narasimhan may not have been motivated by a specific intent to deceive or defraud the MPD, the misrepresentations exceeded mere puffery and showed a degree of dishonesty and carelessness on Narasimhan's part. Accordingly, we determine that the violations of MLRPC 7.1 and 8.4(c) have been established.

**MLRPC 8.4(d) (Conduct Prejudicial to the Administration of Justice)**

Narasimhan excepts to the hearing judge's determination that she violated MLRPC 8.4(d) and contends that she did not engage in conduct that was prejudicial to the administration of justice. Narasimhan maintains that she fully cooperated with Bar Counsel's investigation and testified truthfully before the hearing judge.

"It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice[.]" MLRPC 8.4(d). "In general, a[ lawyer] violates [MLRPC] 8.4(d) when his or her conduct impacts negatively the public's perception or efficacy of the courts or legal profession." Dore, 433 Md. at 696, 73 A.3d at 167 (citation and internal quotation marks omitted). For example, "[f]ailure to represent a client in an adequate manner is conduct prejudicial to the administration of

justice." <u>Attorney Grievance Comm'n v. Bleecker</u>, 414 Md. 147, 175, 994 A.2d 928, 945 (2010) (alteration in original) (citations and internal quotation marks omitted).

Here, clear and convincing evidence supports the hearing judge's conclusion that Narasimhan violated MLRPC 8.4(d). Narasimhan provided incompetent representation to the MPD, due to her lack of experience, skill, and thoroughness, and failed on numerous occasions to respond promptly and adequately to requests for information. Narasimhan was responsible for representation of the MPD, and misrepresented her experience in immigration law on her résumé. Narasimhan's full and cooperative participation throughout the attorney grievance process is the same conduct that we expect of any attorney faced with a complaint. Here, Narasimhan submitted a proposal through a public bidding process sponsored by the MPD, a government agency. Narasimhan's lack of competence in representing the MPD reflected negatively on attorneys and the legal profession, and as a consequence, had the effect of eroding public confidence in the legal profession. Thus, the hearing judge's determination that Narasimhan violated MLRPC 8.4(d) is supported by clear and convincing evidence.[12]

_____

[12] We reference <u>Dore</u> for the following general proposition of law: "In general, a[ lawyer] violates [MLRPC] 8.4(d) when his or her conduct impacts negatively the public's perception or efficacy of the courts or legal profession[,]" <u>Dore</u>, 433 Md. at 696, 73 A.3d at 167 (citation and internal quotation marks omitted), for which <u>Dore</u> quotes from <u>Attorney Grievance Comm'n v. Rand</u>, 411 Md. 83, 96, 981 A.2d 1234, 1242 (2009). In <u>Bleecker</u>, 414 Md. at 175, 994 A.2d at 945, this Court stated that a failure to provide adequate representation is conduct prejudicial to the administration of justice. Here, it is clear that Narasimhan failed to represent the MPD competently, and made false statements as part of a government agency's bidding process, substantiating a violation of MLRPC 8.4(d).

**MLRPC 8.4(a) (Violating MLRPC)**

"It is professional misconduct for a lawyer to[] violate or attempt to violate the [MLRPC], knowingly assist or induce another to do so, or do so through the acts of another[.]" MLRPC 8.4(a). Narasimhan violated MLRPC 1.1, 1.3, 1.4(a) and (b), 7.1, 8.4(c), and 8.4(d). Accordingly, clear and convincing evidence supports the hearing judge's conclusion that Narasimhan violated MLRPC 8.4(a).

## C. Sanction

Bar Counsel recommends that this Court indefinitely suspend Narasimhan from the practice of law in Maryland. Narasimhan requests a reprimand.

In Dore, 433 Md. at 717, 73 A.3d at 180, we stated:

When we impose sanctions, our goal is not to punish the [lawyer], but rather to protect the public and the public's confidence in the legal profession [and] to deter other lawyers from violating the [MLRPC]. To achieve this goal, the sanction should be commensurate with the nature and the gravity of the misconduct and the intent with which it was committed. In determining an appropriate sanction, we often refer to the American Bar Association's *Standards for Imposing Lawyer Sanctions*, which focus on the nature of the ethical duty violated, the lawyer's mental state, the extent of the actual or potential injury caused by the lawyer's misconduct, and any aggravating or mitigating [factor]s.

(Second alteration in original) (citations and internal quotation marks omitted).

Concerning the nature of the ethical duty violated, Narasimhan violated MLRPC 1.1, 1.3, 1.4, 7.1, 8.4(c), and 8.4(d) by failing to competently and diligently represent the MPD, by failing to promptly and fully respond to and advise the MPD, and by making misrepresentations in her résumé and job proposal as to her immigration law experience. As to Narasimhan's state of mind, although Narasimhan did not set out to purposely

mishandle the MPD's case, her inexperience and incompetence got the best of her. As to the actual or potential injury that Narasimhan's misconduct caused, Narasimhan's misconduct negatively impacted the MPD's and the public's perception of the legal profession, and ultimately caused the DOL to deny certification of Dr. Samuel's permanent residency application.

In <u>Attorney Grievance Comm'n v. Davy</u>, 435 Md. 674, 710, 80 A.3d 322, 342-43 (2013), we stated:

> Aggravating factors include: (a) prior disciplinary offenses; (b) dishonest or selfish motive; (c) pattern of misconduct; (d) multiple offenses; (e) bad faith obstruction of the [attorney] disciplinary proceeding[] by intentionally failing to comply with rules or orders of the [Commission]; (f) submission of false evidence, false statements, or other deceptive practices during the [attorney] disciplinary proce[eding]; (g) refusal to acknowledge wrongful nature of conduct; (h) vulnerability of the victim; (i) substantial experience in the practice of law; [and] (j) indifference to making restitution.

(Some alterations in original) (citation and paragraph breaks omitted).

We note that the hearing judge did not find any aggravating factors. On independent review, we discern the aggravating factor that Narasimhan violated several MLRPC in her representation of the MPD, *i.e.*, that she committed multiple offenses.

> The following constitute mitigating factors:

> (a) absence of a prior disciplinary record; (b) absence of a dishonest or selfish motive; (c) personal or emotional problems; (d) timely good faith efforts to make restitution or to rectify consequences of misconduct; (e) full and free disclosure to [the Commission] or cooperative attitude toward [the attorney discipline] proceeding[]; (f) inexperience in the practice of law; (g) character or reputation; (h) physical disability; (i) mental disability or chemical dependency including alcoholism or drug abuse when: (1) there is medical evidence that the [lawyer] is affected by a chemical dependency or mental disability; (2) the chemical dependency or mental disability caused

- 36 -

the misconduct; (3) the [lawyer]'s recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and (4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely; (j) delay in [the attorney] disciplinary proceeding[]; (k) imposition of other penalties or sanctions; (l) remorse; [and] (m) remoteness of prior offenses.

Davy, 435 Md. at 712-13, 80 A.3d at 344 (some alterations in original) (citation and paragraph breaks omitted).

Although the hearing judge did not specifically label the following a finding, as to mitigating factors, the hearing judge stated:

The Court does find that this is not a case of fraud. [Narasimhan] did not set about, in her conduct and actions, with the intention of defrauding her clients. The Court finds this to be a case where a young attorney made mistakes and misrepresentations for the purpose of gaining employment. [Narasimhan], unfortunately, took a case with issues that she was not yet competent to handle with an attorney whose experience she had not thoroughly vetted.

We agree with the hearing judge, and are persuaded of at least two mitigating factors– Narasimhan's inexperience and the absence of a prior disciplinary record.

In Attorney Grievance Comm'n v. Ward, 394 Md. 1, 37-39, 904 A.2d 477, 499-500 (2006), where an attorney violated MLRPC 1.5, 5.3(a), and 8.4(d) in his representation of one client and violated MLRPC 1.1, 1.3, 1.4, and 8.4(d) in his representation of another client, and where the attorney's "misconduct was the result of inexperience, incompetency, and an inability to balance his work schedule[,]" we indefinitely suspended the attorney with the right to apply for reinstatement after sixty days. (Footnote omitted). We noted that there were no "cases directly on point" as to the appropriate sanction for the attorney's misconduct, and stated:

> We have found cases which involved violations based upon neglect, carelessness and unintentional misconduct, but also involved more egregious violations of the M[L]RPC. In those cases, this Court has imposed various sanctions, ranging from public reprimand to indefinite suspension depending on several factors, such as previous disciplinary actions, inexperience, or lack of intent.

Id. at 33, 904 A.2d at 496 (citations omitted). We stated that a reprimand "would be too lenient a sanction because [the attorney]'s violations were neither limited to a single rule violation nor to one client." Id. at 39, 904 A.2d at 499-500. Although the attorney's misconduct "did not rise to the level of a misappropriation of clients funds or intentional dishonesty[,]" his actions "reflected negatively on the administration of justice and the Bar." Id. at 38, 904 A.2d at 499.

Conversely, in a case discussed in Ward, Attorney Grievance Comm'n v. Jaseb, 364 Md. 464, 468, 479, 482, 773 A.2d 516, 517, 524, 526 (2001), we issued a reprimand where an attorney violated MLRPC 5.3(b) (one of five charges brought against her) by failing to adequately supervise her law clerk. In the course of a bankruptcy case, the attorney prepared a bankruptcy petition on behalf of her client and directed her law clerk to file it in the United States Bankruptcy Court. Id. at 477, 773 A.2d at 523. The law clerk failed to file the petition. Id. at 477, 773 A.2d at 523. In a different matter, the attorney made inaccurate representations of fact and law to the trial court and opposing counsel, although the hearing judge determined that the representations were not "intentionally misleading" or fraudulent. Id. at 474-75, 773 A.2d at 521-22. In Jaseb, id. at 482, 773 A.2d at 526, in determining that a reprimand was the appropriate sanction, we stated: "Here, [the attorney]'s inexperience, coupled with her lack of prior misconduct

complaints, and the fact that the client was not prejudiced, must be weighed against her behavior, her inaccurate representations . . . , and her negligent supervision of her recently hired law clerk."

In Attorney Grievance Comm'n v. Floyd, 400 Md. 236, 251-52, 259, 929 A.2d 61, 70, 74 (2007), where an attorney violated MLRPC 8.4(c) by submitting to her employer a letter in support of her petition for a higher salary penned by her husband, who did not share the same surname, and failed to disclose the relationship, and where the attorney omitted her previous employment with her husband from her résumé, we suspended the attorney for ninety days. In so ordering, we explained:

> [The attorney]'s misconduct reflected dishonesty; she violated [MLRPC] 8.4(c) by intentionally concealing the nature of her relationship with [her husband] from the [employer] during her employment application process in order to obtain a higher salary. Moreover, we find it troubling that [the attorney] omitted from her résumé any reference to her employment with [her husband] before she and he relocated to the District of Columbia, although non-legal employment prior to this time was included. We also, however, consider any mitigating factors[.] . . . In this case, [the attorney] has no prior disciplinary record, and the instant violation is not part of a pattern of misconduct. Additionally, she acknowledged her error.

Id. at 258-59, 929 A.2d at 74.

In this case, Narasimhan, an attorney who had been licensed for just over two and a half years at the time the representation at issue commenced, and who had little to no experience in immigration law, sought to obtain the MPD as a client by submitting a résumé and proposal which misrepresented her legal experience. Such misconduct reflected a degree of dishonesty. Once the MPD retained ILG, Narasimhan's misconduct during the representation included incompetence in handling the matter at hand, an

- 39 -

inability or failure to accurately and fully provide information to the client, and the failure to associate with an attorney who was competent in the field. As in Ward, 394 Md. at 39, 904 A.2d at 499-500, we believe a reprimand "would be too lenient a sanction because [Narasimhan]'s violations were [not] limited to a single rule[,]" or a single act of misconduct. Indeed, Narasimhan violated many MLRPC over a course of time, and her actions reflected negatively on the legal profession. Considering the mitigating factors, however, including Narasimhan's inexperience in the practice of law and the lack of a prior disciplinary record, coupled with the hearing judge's finding that Narasimhan did not intend to defraud her clients, we conclude that that appropriate sanction for Narasimhan's violations of the MLRPC is sixty-day suspension from the practice of law in Maryland. The suspension shall begin thirty days after the date on which this opinion is filed.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16-761(B), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST SUDHA NARASIMHAN.**

Circuit Court for Montgomery County
Case No: 28288-M
Argued: March 10, 2014

IN THE COURT OF APPEALS

OF MARYLAND

─────────────────────────────

Misc. Docket AG No. 77

September Term, 2012

─────────────────────────────

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

SUDHA NARASIMHAN

─────────────────────────────

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

─────────────────────────────

Concurring and Dissenting Opinion
by Adkins, J., which McDonald, J. joins.

─────────────────────────────

Filed: May 23, 2014

I write separately not only because I disagree with the holding and sanction in this case, but, as I explain below, because the Majority opinion has worrisome implications for legal practitioners. I disagree with the Majority's conclusion that Respondent violated MLRPC 1.4 and 8.4(d). I am doubtful that she violated MLRPC 1.1. Furthermore, although I agree with the Majority's conclusion that Respondent violated MLRPC 1.3, 7.1, 8.4(a) and 8.4(c), I disagree with the severity of the violations, and consequently, the appropriate sanction.

It is important that we evaluate the conduct in this case in context. As the hearing judge said:

> The Court does find that this is not a case of fraud. The Respondent did not set about, in her conduct and actions, with the intention of defrauding her clients. The Court finds this to be a case where a young attorney made mistakes and misrepresentations for the purpose of gaining employment.

A significant aspect of the Majority opinion with which I disagree stems from its recurring theme expressed as follows: "we have no difficulty in concluding that **Narasimhan, not Rogers, was responsible for representing the MPD**. As such, Narasimhan was required, under the MLRPC, to provide competent representation utilizing 'the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.'" Maj. Slip Op. at 16. (Emphasis added). The Majority relied on this assessment several times to justify its conclusions about several of the Rules that were violated, and the proper sanction. Yet, the hearing judge did not find this. Rather, he found that they "were hired based on Mr. Rogers' expertise and the Respondent's ability to provide local service as a Maryland Bar member."

Indeed, the facts, when examined, do not support the Majority's thesis.[1] The client's understanding was expressed by MPD Director of Human Resources Haines, who agreed that MPD "hired the Immigration Law Group based upon Mr. Rogers's expertise, not that of Ms. Narasimhan[.]" A lawyer herself, Haines knew Respondent had "less than three months of immigration practice experience." She confirmed that the MPD "could not have moved forward" without Rogers and "felt comfortable that he would meet our need and so we selected him." Director Haines was convinced from the beginning that Respondent "alone [lacked] sufficient experience to do this." She confirmed that Rogers would serve as "lead counsel" and Narasimhan would be a "local liaison" or "go-between between ourselves and Mr. Rogers." She understood that Respondent would be "in constant contact with Mr. Rogers[,]" and that "he would look at everything before she sent it to us and that he . . . would basically be directing her - -

---

[1] This understanding is consistent with the Joint Venture Agreement between Narasimhan and Rogers, which clearly set forth that Rogers was lead counsel. In its words,

> The Parties hereby acknowledge that [Rogers] has the experience, legal knowledge and, the business acumen in the Joint Venture. **[Rogers] shall be primarily responsible for providing advice and legal expertise** to the Joint Venture. [He] shall also be primarily responsible for research of legal issues that will arise in the conduct of the law practice within the Joint Venture.

Joint Venture Agreement 5.01 (Division of Labor) (Emphasis added).

directing her activities."[2]

Consistent with the MPD's understanding, Rogers was on the phone during the December 10, 2009 conference call, and Respondent was absent because of a planned trip outside the country.[3]  Haines also recalled that there were "a few emails back and forth" between Respondent and MPD during that trip.  Haines also agreed that Respondent appeared "to be dedicated to customer service[.]"  When asked about difficulties in communicating with Respondent, Haines replied,

> The only real problem that we had was, when there was a need for us all to talk together, it was very difficult getting the parties together, either because of conflicts that Mr. Rogers had or conflicts that Sudha[4] had, but it was - - on at least two occasions where it was important for us to meet quickly, it

---

[2] Dr. Samuel did not participate in the hiring of ILG. She expressed the opinion that Respondent was "their lawyer" but, when asked, had no particular basis for this opinion.

[3] MPD issued the procurement contract for legal services provided by ILG on November 20, 2009. Respondent had scheduled a trip to India between December 3, 2009 and January 17, 2010, and informed Haines of this right after the bid was awarded. Designating Respondent's trip to India as a failure to communicate, when Rogers, the recognized senior partner with immigration expertise, participated in the first conference call occurring on December 10, during Respondent's trip, is simply unfair.  It is not required that two attorneys participate in each client meeting.  The Majority also charges that Narasimhan failed to respond to the MPD's request for a second conference call on December 21, 2009.  The facts as shown by e-mails in the record are that Rogers set up a second conference call for December 21 when talking with the client during the December 10, 2009 conference call. Respondent kept abreast of the discussions in that call by reading e-mails Haines wrote summarizing the meeting, and she sent e-mails to Rogers.  The record contains conflicting testimony over whether the December 21 conference call took place, and the hearing judge made no findings on this point.

[4] In their testimony, Haines and Dr. Samuel usually referred to Respondent by her first name, Sudha.

3

took more than a few days to get it done. That's the only thing I, personally, was aware of.

Haines amplified by explaining that "trying to get them together for a conference phone call was problematic, . . . there was a lot of interaction between Dr. Samuel and Sudha, and I didn't perceive that there was any problem when they were actually interacting with each other."

A primary defense offered by Respondent, especially to the incompetency charge, was that, although she alone did not have sufficient knowledge and experience to undertake the legal immigration work necessary to secure a permanent residence for Dr. Samuel, she only undertook the work in conjunction with her partner, Rogers, who, she believed, had 16 years of experience in immigration law. The Majority rejects Respondent's defense saying:

> Although an attorney can provide competent representation through association with an attorney "of established competence in the field in question[,]" MLRPC 1.1 cmt. [2], such was not the case here. To begin, setting aside any issue as to Narasimhan's competence, or lack thereof, as the hearing judge concluded, Narasimhan failed to ascertain whether Rogers was, in fact, competent in the field of immigration law.

Maj. Slip Op. at 14. The Majority opines that Respondent should have examined Rogers's qualifications and expertise by checking with some third party, and that verifying his Bar membership, as she did, was not sufficient.[5] Maj. Slip Op. at 14–15. In

---

[5] In a footnote the Majority declines to establish a "bright-line rule as to what would qualify as properly ascertaining an attorney's 'established competence,' as each case is fact-specific." Maj. Slip Op. at 15 n.7.

my view, this sets up an unduly harsh standard for young attorneys who seek jobs. I know of no registry or procedure, other than verifying that Bar membership is in good standing, to determine what expertise an attorney possesses.[6] If an attorney seeking a job has a sophisticated knowledge of the field of practice, she might telephone other practitioners to ask about the lawyer in question. But a person fresh out of law school, who may not know many attorneys, let alone attorneys who specialize in a given field, just does not have access to this information. When an older lawyer offers her a job, tells her of his experience, and she verifies his status as a member of the Bar, a younger lawyer should not be disciplined for failure to ascertain some more precise method for objective measurement of his expertise. Respondent's actions in associating with Rogers to undertake an immigration practice may have been naive, but they were not unethical.

To hold that Respondent was expected to be able to complete the legal work necessary to obtain a Green Card for Dr. Samuel on her own, without guidance from Rogers, is an extremely unfair application of the MLRPC. Under these circumstances, Respondent should only be held to the standard of a novice attorney, working under the supervision of an attorney experienced in the field. The Majority's refusal to acknowledge Respondent's status as a novice attorney in an apprentice-like relationship with Rogers is pertinent to more than one of the alleged instances of misconduct. I address the particulars below.

---

[6] Lawyers often join associations of other lawyers in the same specialty, but only a select few of these associations have measurements of expertise as a condition of membership.

5

**MLRPC 7.1 (Communications Concerning a Lawyer's Services)**

I agree that Respondent made minor misrepresentations about her experience in the resume she submitted to the Metropolitan Police Department (MPD), thereby violating MLRPC 7.1 and 8.4(c). Although she truthfully told the MPD that she had less than three months as a practitioner in the field, and did not purport to be qualified to handle the MPD work for Dr. Samuel on her own, she did exaggerate slightly the specifics of her experience. This is a violation for which some discipline is appropriate. As I indicated earlier, neither Respondent nor the client, MPD, considered her experience to be material in the decision to hire the Immigration Law Group ("ILG") for the immigration law work at hand, a factor to which we should accord significant weight.

**MLRPC 1.1 (Competence)**

On March 24, 2010, Respondent filed the Employer's Application for Permanent Employment Certification for the position of "Project Specialist," known as Form 9089. This, apparently, is the first step required to obtain a Green Card. On May 3, 2010, the Department of Labor, Office of Foreign Labor Certification (DOL) denied the certification, indicating that the Form 9089 was incomplete in that it failed to provide information known as the Prevailing Wage Determination, among other things. Clearly, this filing contained significant errors by both Rogers and Respondent, who worked on the filing together. Petitioner's expert, an immigration practitioner, expounded at length about Respondent's lack of expertise, and failure to meet the standard of care, testimony

6

that was accepted generally by the hearing judge.[7]

Yet, Respondent promptly made efforts to correct her error and, under the guidance of Rogers, secured a new Prevailing Wage Determination from the appropriate division of the DOL, and filed a more complete form within less than 30 days. As acknowledged in the DOL's November 15, 2011 ruling,[8] the deficiencies were all completed in this second submittal. Despite this compliance, the DOL again denied the labor certification, on grounds that 20 C.F.R. 656.17(a) provided that "[i]ncomplete applications will be denied." DOL explained: "PERM is an exacting process, designed to eliminate back-and-forth between applicants and the government, and to favor administrative efficiency over dialogue in order to better serve the public interest overall, given the resources available to administer the program."

Respondent, was, without doubt, "in over her head" in trying to take the appropriate steps to secure permanent residence status for Dr. Samuel. But, in bidding for and undertaking the work, she did so in reliance on Rogers's 16 years of experience,

_____

[7] A significant aspect of the deficiencies in Form 9089, as explained by Respondent, was caused by her mistake in mailing an earlier rough draft of Form 9089 to the DOL. This submitted Form 9089 omitted significant information as required to complete sections F-2 through F-6, despite MPD having provided that information to Respondent. Those sections were complete on the most current draft, which Respondent failed to send.

[8] This ruling was made by the Board of Alien Certification Appeals, which affirmed the initial denial of labor certification by the Certifying Officer.

and her work was under his guidance.[9]  She admitted sending an incomplete version of Form 9089 by mistake when she had at her fingertips a more complete version.  This proved to be a significant error because, as its denial memo said, the DOL policy is to reject filings that are incomplete, without allowing amendment.  Petitioner's expert also delineated other errors, although the evidence does not reveal whether these were entered into the computer by Rogers or Respondent, as both made entries on the form.  Both Respondent's testimony and e-mail exhibits show that both filings of Form 9089 were read and approved by Rogers.  Rogers did not testify, and the record does not reveal whether he was charged with any violations in Arkansas or any reciprocal discipline here.

With the Majority opinion as written, I fear the implications of holding young lawyers accountable, in the *disciplinary context*,[10] for the negligence or inattention of more experienced lawyers who supervise them.  It can be efficient—benefiting both the client and the law firm—for an inexperienced lawyer to act in an apprenticeship role, handling certain details of a matter, including regular client contact.  Moreover, in many instances, a client, like MPD here, is fully aware that the inexperienced lawyer will not provide the expertise and judgment expected of the more experienced lawyer.  If young attorneys, working in a firm, become reticent to interact freely and openly with clients, the long tradition of apprenticeship as an entryway to our profession will suffer.  I worry

---

[9] This reliance is exemplified in a May 8, 2010 e-mail in which Respondent emphatically requests Rogers to supply her with an instruction sheet for sufficiently completing a Form 9089 submission to the DOL.

[10] Liability in negligence is an entirely different issue.

that the Majority opinion imperils the viability of this time-honored method of beginning a legal career.

As the Preamble to the MLRPC says, and many of our decisions reflect, "the Rules presuppose that whether or not discipline should be imposed for a violation, and the severity of a sanction, depend on all the circumstances, such as the willfulness and seriousness of the violation, extenuating factors and whether there have been previous violations." MLRPC, Preamble: A Lawyer's Responsibilities [19]. In deciding this case, we should bear in mind that "'mistakes are the inevitable lot of mankind'" *Baranski v. Serhant*, 106 F.R.D. 247, 250 (N.D. Ill. 1985) (quoting *Re Taylor's Estate*, 22 Ch. D. 495, 503 (1882)), and lawyers are not immune.

Whether we ultimately decide to grant Respondent's exception to the finding that she violated MLRPC 1.1 is a close call. Clearly, the denial of the labor certification was caused, at least in part by Respondent's failure to pay attention to details at a time when details were terribly significant. I have no doubt that she regrets this and has learned from this mistake. Under these circumstances, even if she violated MLRPC 1.1, such violation, by itself, would justify no more than a reprimand.

### MLRPC 1.4 (Communication)

Respondent's alleged failure to communicate is a major issue used by the Majority to justify Respondent's discipline. As I understand the evidence, Respondent's alleged failures to communicate with the client consisted of (1) the failure to set up a second conference call with Rogers and MPD in December 2009, when Respondent was on a planned trip to India that the client knew of from the beginning of the representation; (2)

9

the failure to cause Rogers to provide substantive information about the immigration process in response to an April 15, 2010 e-mail;  (3) the failure to advise MPD regarding how to secure a one-year extension for Dr. Samuel in May or June, 2010, and (4) the failure to set up a conference call with the client and Rogers for a 6-day period in July.

The Majority says that "there were multiple occasions on which Narasimhan failed to respond at all to requests for information, and she also failed to provide a requested status update."  Maj. Slip Op. at 17–18.  *See also*, Maj. Slip Op. at 25 ("It is readily apparent, however, that on many occasions Narasimhan failed to promptly respond to communications from the MPD, to keep the MPD reasonably informed about the status of the case, and to provide information necessary . . . ."); Maj. Slip Op. at 34 (Respondent "failed on numerous occasions to respond promptly and adequately to requests for information.").  With due respect to the Majority, I submit that the record does not support these characterizations.  To explicate my position, unfortunately, I must delve into some detail.

**(i)   December Conference Call**

Rogers conducted an initial telephone conference call with Haines and Dr. Samuel on December 10, 2009, in which he outlined the process for securing permanent resident status.  As the e-mails in the record reveal, during this call, Rogers set up the plans for the December 21, 2009 conference call.  Respondent was in India and there is no indication that Respondent was asked to facilitate that second call in any way.  If Rogers did not follow through and have this call, it is decidedly unfair to blame Respondent.  This was not a violation of MLRPC 1.4.

**(ii)  Communications in April**

If there was any failure by Respondent to keep the client reasonably informed about the status of the matter, it was minor.  The record is rife with e-mails from Respondent to Haines and Dr. Samuel.[11]  Although Dr. Samuel testified that she asked questions of Rogers and Respondent in an April 15 e-mail, and received no response until April 27, the record reveals that Respondent replied on April 18, that "Gordon will respond with all the answers."[12]  When Respondent's counsel brought her attention to this reply, Dr. Samuel responded: "I did not receive immediate answers, so just telling me that somebody is going to respond and then receiving the answers to the question 12, 13, 14 - - even five days later - - is just unreasonable to me[.]"  Dr. Samuel evidently did not accept what her superior, Haines, negotiated as the terms of the representation: that it was understood that Rogers had the immigration expertise, that Respondent did not, but would provide local assistance, gather information, speak with the client, and assist Rogers in preparing the necessary filings.  There was no evidence that Respondent had

---

[11] The documents introduced by Petitioner include 24 e-mails from Respondent to MPD from January to mid-July, 2010.

[12] When Dr. Samuel e-mailed "Gordon and Sudha" on April 15, 2010, for some additional information "[w]hen you have an opportunity," Respondent e-mailed Rogers the next day, asking him to "respond to this ASAP."  On May 2, 2010, Rogers did respond to the e-mail, although his response may not have been complete.  Haines described a conference call with Rogers, Respondent, Haines and Dr. Samuel on Saturday, May 8, in which that issue was discussed, and they talked about the options of refiling and appealing.  Rogers guided the client as to these options, and MPD decided to resubmit a new Form 9089 to the Department of Labor, which was done on June 4, 2010.  According to Haines, Respondent "respond[ed] quickly to resubmit the forms."

11

any power to control Rogers's schedule, or guarantee his responsiveness, and MPD had no reason to expect that she did.

### (iii) Communications After Initial Denial By DOL. (May – July)

**May**. The labor certification sought by the original submission of Form 9089 was denied by the DOL on May 3, 2010, on grounds it was incomplete. Dr. Samuel complained in her testimony that, thereafter, she had some difficulty arranging a face-to-face meeting with Respondent on or around May 8, and they did not actually meet until May 27. Dr. Samuel explained: "[I]t was something I wanted to do more so, closer to when we received the denial, but - - you know, [Respondent's] schedule just never seemed to be open enough for her to meet with me[.][13] The written e-mails during this period provide specific evidence of communications which negate the general complaint that Dr. Samuel made. In a May 7 e-mail, Dr. Samuel asked Respondent to "address the missing information and make the necessary corrections," and Respondent replied the same day, indicating they were to speak at 2:00 p.m. the next day. Apparently, a face-to-face meeting did not take place, but Haines verified that a conference call with Rogers, Respondent, Haines and Dr. Samuel occurred on Saturday, May 8, in which that issue was discussed. During this call, they talked about the options of refiling or appealing. Rogers guided the client as to these options, and MPD decided to resubmit a revised Form 9089 to the DOL.

---

[13] Other than a May 7 exchange, there are no e-mail communications in May or June of 2010 in which Haines or Samuel requested information or a meeting with Respondent.

12

Respondent responded quickly to resubmit the form. She e-mailed Rogers on May 8, asking him to fill out "the M1 section" and "the F section of the 9089 form." From May 8–27, Rogers and Respondent were working on completing a revised Form 9089. In a May 12 e-mail, Respondent sent Rogers certain information needed to "re-fill the 9089 form," making comments and asking questions about aspects of the form. Rogers completed the form, and in a May 16 e-mail to Dr. Samuel and Haines, asked for "a little more information" that he thought would be helpful to include. Respondent, meanwhile, spoke to two government agencies about securing the necessary "[p]revailing wage information," reporting to Rogers in a May 20 e-mail.

Importantly, Dr. Samuel was aware of the work being done—between May 14 and May 25 there were several e-mails between Rogers and Dr. Samuel regarding details of the revised Form 9089. After talking with Dr. Samuel on May 26 to arrange a meeting to sign the revised document, Respondent e-mailed Dr. Samuel and Haines, indicating: "we are on for tomorrow May 27th at 9:30 am." Respondent sent the revised Form 9089 by Federal Express to the DOL on May 27.

In sum, regarding May, 2010, after a four-way conference call on May 8, Rogers *was communicating with Dr. Samuel* about the revisions to Form 9089 that he and Respondent were making to correct the deficiencies of the original filing. Certainly Respondent was not obligated to communicate with Dr. Samuel when Rogers was already doing so.

**June**. On June 8, Respondent faxed a follow-up letter to the DOL requesting relief from the "Final Determination Denial" of the Form 9089. On June 14, she told

Rogers that she was also working on completion of Form I-140, known as "Petition for Immigrant Worker," which she would send for his review and approval. She included a link from the DOL website indicating "[a]n I-140 petition is the second step in the Green Card process" after the "Labor Certificate is approved[.]"[14]

On June 17, 2010, the Office of Foreign Labor Certification e-mailed Respondent notice that it had issued a "prevailing wage determination for the position of Project Specialist" and on June 21, Respondent informed the DOL office reviewing Form 9089 of this receipt. As indicated above, this determination proved to be fruitless, as the DOL would later, in November, reject the Form 9089 labor certification request, even though the requisite information was provided, on grounds it was not complete when first filed.

**July – MPD's Termination.** In a July 14 e-mail, Dr. Samuel requested a meeting with Rogers for July 16. On the same day, Respondent replied, indicating that Rogers was in Panama and she would "have to see if [Rogers] is available to talk this Friday." In

---

[14] Meanwhile, the lack of success with the Form 9089 had eroded MPD's trust in Respondent's capabilities. In a belated effort to record the MPD's dissatisfaction with the original 9089 filing, on June 15, Haines sent a letter addressed to Rogers, indicating that she found it "prudent to send this letter in response to some ongoing issues." She complained about the March 24, 2010 denial by the Department of Labor, the delay caused by the need to resubmit Form 9089. In this regard, she said that his resume indicated that he had the "expertise, knowledge, skills and abilities necessary to respond to these immigration issues[,]" but complained that Respondent "either does not have sufficient experience to address these issues, or, she is distracted and does not pay sufficient attention to what she is doing." Haines complained that the Department of Labor rejected the application because of the omission of information that MPD had provided to Respondent. She insisted: "I need some assurances that you will either deal with this matter directly or that Ms. Narasimhan be more closely supervised for all activities in the future."

14

that e-mail, she also advised that she and Rogers were "working on your I-140 and I-485 application." Respondent followed up the next day with another e-mail advising Dr. Samuel that Rogers, after checking his schedule, could not fit in a conference call that Friday, but could do so the following week.[15] It was six days later, on Tuesday, July 20, that Haines sent an e-mail terminating the MPD's attorney-client relationship with ILG, and asking ILG to send a final bill.

### (iv)   Conclusion Re: MLRPC 1.4

Rejecting a key defense offered by Respondent that, in light of her limited experience, her role was to play the assistant to Rogers, the Majority says: "As to Narasimhan's claim that she responded by facilitating communication with Rogers, Narasimhan accepted primary responsibility for representing the MPD; as such, it was incumbent upon Narasimhan to provide the requested information herself or to ensure that Rogers responded in full." Maj. Slip Op. at 18. As I said before, the hearing judge did not reject or otherwise address this defense. I submit that the evidence does not support the Majority's treatment.

Dr. Samuel, without the testimonial support of her superior, Haines, made a general complaint against Respondent about supposed failures to communicate. Yet, as my discussion above demonstrates, neither Dr. Samuel nor the hearing judge, provided enough specific information for us to conclude Respondent violated MLRPC 1.4 by

---

[15] In that e-mail she advised Dr. Samuel: "I have first-class mailed you a letter yesterday giving you an update about your 9089 form. You should receive it today or tomorrow."

15

delaying in providing replies to requests for service. Lawyers cannot always provide legal advice as fast as their clients would like, especially since answers to many questions require research, thought and judgment. In our role overseeing the discipline of lawyers for ethical violations, we should be careful to fully understand the context of the alleged delay, and discipline only for those delays that qualify as neglect of duty.

In light of Respondent's diligent efforts to communicate overall, and the evidence of the work performed and communications, I submit that Dr. Samuel's general testimony, such as "[Respondent's] schedule just never seemed to be open enough for her to meet with me . . ." is not sufficiently specific to provide clear and convincing evidence that Respondent violated MLRPC 1.4.[16] Neither Dr. Samuel nor the hearing judge said anything more specific than that. It is my strong opinion that the generalities of both Dr. Samuel and the hearing judge on this topic do not rise to the level of specific delays that would justify our finding that there exists clear and convincing evidence of a failure to communicate. Conclusory testimony does not become clear and convincing evidence simply because a hearing judge deems it so.

**MLRPC 8.4(d)**

---

[16] She also complained:

> "It was very difficult to get her on the phone. Definitely very difficult to meet face-to-face, and then I found that there was a lot of lag time between responses to emails, so again - - it was a time-sensitive matter, so if a question popped in my mind or if Diana had a question or some other member of the department had a question, we'd shoot off an email, and response, so it was extremely difficult."

16

Finally, I do not agree that Respondent violated MLRPC 8.4(d). This Rule should be reserved for more serious violations than have been demonstrated here. The Majority relies on our opinion in *Att'y Grievance Comm'n v. Dore*, 433 Md. 685, 707–08, 73 A.3d 161, 174 (2013) as analogous support for finding a violation of MLRPC 8.4(c) and supporting an indefinite suspension with the right to reapply after 60 days, reasoning that both cases involved dishonesty and misrepresentation without any intent to deceive. In the Majority's view, "Narasimhan's lack of competence in representing MPD reflected negatively on attorneys and the legal profession, and as a consequence, had the effect of eroding public confidence in the legal profession." Maj. Slip Op. at 34. I see a fundamental distinction between the two cases. In *Dore*, we dealt with an experienced attorney who authorized hundreds of false statements made to multiple courts involving hundreds of foreclosure actions all over Maryland. 433 Md. at 722, 73 A.3d at 183. That case involved an entire system of misrepresentation that required new court proceedings in multiple counties to correct the problem. *Id.* I agreed that the attorney's actions in *Dore* constituted conduct prejudicial to the administration of justice in violation of MLRPC 8.4(d) because of the magnitude of the filings in question, the involvement of the courts, and the attendant publicity. I do not see the events here as remotely comparable. We should not transform every act of negligence by an attorney into a violation of MLRPC 8.4(d).

## Conclusion

The exacting approach exemplified by the Majority's opinion will not further the principles motivating our adoption of the MLRPC. Rather, it will only serve to amplify

17

the anxiety an attorney suffers when faced with the complexities of modern practice. Under all of the circumstances, including her misrepresentation about her prior experience, and even if we find a violation of MLRPC 1.1, I think a flat suspension for 15 days is fully sufficient sanction for Ms. Narasimhan.

Judge McDonald authorizes me to state that he joins in this concurring and dissenting opinion.